Chief Justice Robertson
delivered the Opinion of the Court.
In June, 1808, Henry Clay and William Lytle entered into a written contract for exchanging real estate which Clay owned in Louisville, fora house called u The Trav-eller’s Hall,” and for a lot with a brick stable thereon, and for other property, all of which Lytle held in Lexington.
On the 9th of November, 1808, Clay sold the stable and the lot on which it stood to John P. Wagnon, for eighteen hundred dollars, fa part of which, to wit, eight hundred dollars, was then paid in four chandeliers, and the residue, one thousand dollars, was to be paid in three years, with accruing legal interest from the first of November, 1808,) and agreed to convey the legal title upon the payment of the whole price.
A writing, containing their mutual stipulations, having been executed by the parties, was assigned by Wag-non to George Matthews, in 1809; by Matthews to William T. Barry, in 1810; by Barry to John T. Mason, on the 30th of June, 1819, and by Mason to Robert Wick-' Jiffe, in August, 1819.
*586 There had been two other intermediate sales of the lot — one byBarry to Young, and the other by Young to Castleman; but Clay’s covenant had not been assigned to either Young or Castleman, and, in 1825, the contract between them was rescinded, by a decree rendered on a bill which had been filed for that purpose, by Castle-man, in 1815.
In 1817, Wickliffe, who, by some contract with Philips and wife, claimed one moiety of the lot, brought an action of ejectment in their names against a tenant in possession under Castleman; and, in March, 1819, obtained a judgment of eviction for the entire lot, of which possession was-given, by a habere facias, prior to the assignment to Wickliffe of Clay’s covenant.
In 1818, during the pehdency of the action of ejectment, Clav and Lytle, and others who were interested, apprehending that there was'no other available title to the lot than that of Philips and wife, and being desirous to quiet further controversy, proposed to Wickliffe, who claimed to act as the agent of Philips and wife, to sell both his own right and the title of his constituents to Ly-tle; and accordingly W ickliffe covenanted to make the title, or cause it to be made, to Lytle, upon the payment of the stipulated consideration ($1250,) for which Lytle gave to him a promissory note. But Lytle having failed to pay any part of the twelve hundred and fifty dollars, and having also become insolvent, the title was never conveyed to him.
In 1814, Young, then holding the lot under Barry, uninfluenced by any apparent or presumable apprehension of a defect of title in Lytle or Clay, pulled down the stable, then much impaired by age and.use, and converted the materials into another house, which he built on another lot. The stable had been built by Lytle, in 1801, and had been used as an appurtenance to Traveller's Hall” prior to Wagnon’s contract with Clay. But Wag-non seems to have designed to use it is a liverv stable.
Clay (claiming a bidance still due from Wagnon on the contract of 1808,) and Wickliffe (claiming damages as assignee of that contract,) agreed, as must be inferred from an undenied allegation to that effect in one of *587 Wickliffe’s cross bills, that Clay should file a bill in chancery against Lytle, Wiekliffe, Barry and Mason; and that Wiekliffe should make his answer a cross bill, and thus, at once, without circuity, have the whole controversy settled.
Accordingly, in July, 1825, Clay filed his bill, alleging, among other things, the most of the foregoing facts, and praying, first, for a specific execution of the contract between Lytle and Wiekliffe; and, second, for an enforcement of an equitable lien which he seemed to suppose that he held on the lot for the unpaid residue of 'the price which Wagnon had covenanted to pay for it.
Lytle never answered the bill, which was eventually abated as to him in consequence of his death.
Wiekliffe, in sundry answers, all in the nature of cross bills, resisted a decree for enforcing his contract with Lytle, and prayed for a decree rescinding the contract between Clay and Wagnon, and compelling Clay to pay to him (Wiekliffe,) the whole amount of what he had received on that contract, without any abatement for the stable, or for the use of the lot or the stable, and also prayed for a decree against Mason and Barry.
Clay, in sundry answers to Wickliffe’s cross bills, and. in amendments to his original bill, set forth various additional facts, and insisted, first, that the chancellor could not take cognizance of Wickliffe’s cross bills for rescission and for damages; second, that the stable was the chief ingredient in the estimated value of the property which he sold to Wagnon — -that it was worth more than the lot, and that, as Wagnon and those who held under him enjoyed the full and undisturbed use of the stable and of its entire value, without responsibility, there had been no breach of covenant, or failure of consideration to the extent of the estimated price of the stable; and that, consequently, he (Clay) should be entitled, on a rescission of the contract, to a credit pro tanto, and should beheld liable for no more than the estimated., value of the lot without tne stable; third, that the price which he agreed to allow for the chandeliers, was merely nominal, and exceeded their real vendible value more than four hundred dollars, and that he allowed, in the *588 contract, eight hundred dollars for them, not because they were deemed of that value, but only because Wag-non agreed to give him, for the stable and lot, a price correspondently exorbitant and fictitious; and, therefore, that he (Clay) should not be charged iu equity with more than the actual value of the chandeliers.
Decree of the circuit court.
Appeals,
Errors assigned by Wickliffe.
Errors assigned by Clay.
The circuit court, having continued the case as to Barry and Mason, and heard it, by consent, as between Clay and Wickliffe, decreed, at the October term, 1831, that the contract between Clay and Wagnon should be rescinded; and that Clay should pay to Wickliffe the amount which had been paid on that contract, with six • per cent, thereon from the times when received; “until paid,” after deducting nine hundred and sixty four dollars and thirty cents — the proportionate value of the stable in the aggregate price of eighteen hundred dollars, exceeding seven hundred and fifty dollars (the value of the stable as reported by commissioners,) in the ratio in which eighteen hundred dollars (the price allowed in the contract for the lot and stable,) exceeded fourteen hundred dollars — their total actual value at the date of the contract, as estimated in the report of the same commissioners; who had been appointed to ascertain by proof, and report the' true value of the lot and stable at the time of the contract, and also their then relative values; and also, that so much of the nine hundred and sixty four dollars and thirty cents as should remain after extinguishing the eight hundred dollars, which had been paid in the chandeliers, should be applied, without accruing interest, as a credit on the second payment made by Wagnon, on the 6th of September, 1809.
From that decree both Clay and Wickliffe have appealed.
Wickliffe insists, that the court erred, first, in hearing the case as between him and Clay alone; second, in not decreeing finally in his favor against Barry and Mason, and, third, in allowing the credit for the stable.
The errors assigned by Clav may be reduced to the following propositions: — first, that the circuit court had no jurisdiction of Wickliffe’s cross bills; second, that no decree ought to have been rendered against Clay; third *589 that he ought not to have been charged with as much as eight hundred dollars for the chandeliers, and, fourth, that, in other respects, the decree is exorbitant and unjust.
part¡osCOnsent-ing to a sepa-^cause^as^between themsel-Ire’oTheT parties) waive any oll-iectlon tilele may be to that course; and cannot avail themselves of the irregularity — if any —upon an appeal.
An appeal granted, becomes a nullity upon a failure to bond as required; and will not becon-this sidered in court.
The connection of the matter of a dross bill — be oí^eonlmhie— bill — ifthe-ote object of a bill were to enforce a contract, a cross bill to rescind a different contract, and with other parties (about the same property) would not lie.— or equitable-with the subject matter of the original bill,gives the chancellor jurisdiction of the cross bill— of which he can not be ousted by a dismission
But where the vendor of land, among other things in his bill, asserts a lien for the purchase money, against an assignee of his covenant fora title, the latter may maintain a cross bill for a rescission of the contract.
By consenting that the case should be heard as between himself and Clay alone, Wickliffe waived all objection to the hearing, even could there otherwise have been any available objection ,to such a hearing. And, although it appears from a supplemental record, that, at a subsequent term, the circuit court dismissed Wickliffe’s cross bills against Barry and Mason, nevertheless, as the appeal bond which Wickliffe was required to execute on his appeal from that decree, was never executed, that appeal is not before this court, and therefore the second error, as assigned by Wickliffe, cannot be now considered. Clinton et al vs. Philip's Adr. 7 Mon. 117.
As the third error which has been assigned by Wick-liffe, is necessarily connected with the fourth error which has been assigned by Clay, they will be considered together. We shall, therefore, proceed to consider, in their numerical order, the errors of which Clay complains.
I. It is not necessary to enquire whether the chancellor would have bad jurisdiction of an original bill containing the matter exhibited and relied on in the cross bills. Nor is it material now to decide whether, as the contract between Clay and Wagnon was a covenant inter parties and contained mutual stipulations, and therefore was not assignable so as to pass to the assignee any legal interest, a suit at law in the name of Wagnon, for Wick-liffe’s benefit, was the only proper remedy for Clay’s breach of the covenant; or whether a suit in chancery for damages, might have been maintained by Wickliffe, in his own name, against Clay; for, whether the matter of the cross bills be, per se, legal or equitable, the jurisdiction depends solely on its connection with the subject matter of the original bill to which they responded. Therefore, had the enforcement of the agreement be *590 tween Wiekliffe and Lytle been the only object of Clay’s bill, the chancellor would have had no jurisdiction over Wio'-.iiffe’s cross bills for rescinding a different contract, and between other parties. But, as Clay also prayed for a decree enforcing a lien which he asserted as resulting to him in equity, in consequence of his contract with Wagnon, and therefore prayed, virtually, for a specific execution of that agreement also, Wiekliffe had a right to make his answer a cross bill, and retort a converse prayer for a rescission of the same contract, and for an "adjustment of ail consequential rights and liabilities, whether legal or equitable; and Clay’s subsequent dis-mission of his bill did not affect Wickliffe’s cross bill.
Where a vendor of land cannot make the title, he must, submit to a 'rescission, and retu-n of the consideration.
The valuation which the parties put upon a commodity given Sf received in payment, or in barter, must, in general, betaken, by the chan cellar, as the actual value.
Ofthestable^c.
II. As it is evident that Clay cannot make a title, he should not object to a rescission of the contract between himself and Wagnon, and a restitution, upon equitable principles, of the value which he had received for the lot; and, consequently, so far as he is concerned, it was* but right to decree a rescission qt least.
III. The vendible value of the chandeliers depending,as such value of such a commodity necessarily did, on-the taste and judgment of the vendor and the purchaser, and on other adventitious and variable circumstances,, the price at which they were estimated in the contract, by the parties themselves, should not be reduced or augmented by the chancellor, unless facts, far different from any which have been established, had appeared to justify some equitable modification according to a different standard; for Wagnon might not have been willing to take for the chandeliers less than eight hundred dollai-s, even though their actual value, in the opinion of other persons, had not exceeded four hundred dollars; and Clay might not have been willing to allow more than eight hundred dollars, even though some other persons had deemed them worth sixteen hundred dollars.
IV. The last question upon the merits involves the whole measure of right between the parties, and is, of course, more comprehensive and important than all'the other points together.
Upon rescinding the contract, Clay’s equitable responsibility to Wiekliffe, or whoever may be entitled to the *591 full benefit of Wagnon’s equity, should be precisely what it would have been to Wagnon himself, had there never been any assignment by him. And, as no statutory rule is applicable, the measure of responsibility must be regulated by reason and analogy, and the dictates of conscience and equity. The criterion which all these seem to establish, is, that the loss actually sustained should be repaired, so far, and so far only, as correspondent benefit was received.
Where one in ulnd^helcUSona fide,as his own, buildings thereon,he (orthose claiming, under him) may remove them .with out incurring any responsibility to the owner of the para mount title*, forcings «pon it, which and”thenS)o£s a péaring,hisven-dor, upon a rescission of their buildings sore-theh^estima'ted contract, will be entitled to retain, out of the consideration to be restored, the value of the value at the time of the sale, but so much as they wouldhavebeea worth (preserved with common care) as additions to tfie fund at the time equivalent4-0^ what the occupant could have recovered for them of the successful claimant.-And where the removal was without the consent or privity of the party against whom the decree for a restoration of the purchase money, is obtained — hemay (because of the difficulty of the proof) Recito re-* fain the value of the buildings according to the above rula, or as moveable structures. Tire use of land, and the interest on the consideration paid for it, are, in general, to be considered equivalent, and to be set off against each other.— But, as the evictor may recover for mesne profits for 5 years, the party evicted is entitled to interest," for the same term, on the consideration recovered back, from his vendor.
*591 . There is no reason to doubt that Lytle took possession of the lot, not as a wilful trespasser, but in good faith, (not then knowing or apprehending that it was the property of Philips and wife,) and that, whilst thus possessed, he erected the stable in equal good faith: and , 1 . '. , . . therefore, he, or any other person claiming under him, had a perfect right, according to the doctrines of the . , , , . . , . , . 1 , civil law, altogether consistent in tins respect with the principles of the common law, to remove the stable, without doing any injury to the Tot itself, whilst he was-in possession; and consequently, by such a removal, no liability was incurred to the true owners of the lot. To the extent then of the valúe of the use of the stable, until its removal, and of its value at that time as a movable structure, Clay had an indisputable right which he transferred to Wagnon, and of which the. latter and others ii. „ , , under him enjoyed the lull benefit; and, to that extent, therefore, no damage resulted from the eviction from the lot. Even had there been no removal of the stable, Clay, or the person holding under him, would, after eviction, have been entitled to the accessary value which tbe stable imparted to the lot at tbe time of eviction; and, in that event, there would, to that extent, have been no loss to the vendee; because, so far at least, an available and beneficial right had been transferred to him, and of which the eviction could not-have divested him. Though Clay’s right to the stable was ostensibly less valuable than it would have been had his title to the lot been perfect -arid paramount, still it was potentially *592 equivalent to the price at which it was estimated in the contract} and was actually so, if the amount which the evictor would have been bound to pay for it, had it never been pulled down, or the amount to which it would *iave entitled Young, had he been evicted before it was removed, would have been equal to its value at the date of the contract between Clay and Wagnon.
It is argued, however, that there should be no enquiry as to the value of the stable at any other time than when it was sold by Clay; because Young removed it voluntarily and without being influenced by any apprehension of a defect of title; and therefore it was used and appropriated just as it would have been had Clay’s title been unquestionable, and was consequently as beneficial to the vendee, as it would have been if there never had been any eviction from the lot; and that, therefore, as Wagnon, and others holding under him, never lost the stable, Clay should not account for any portion of the. price which he received foi\it, or at which it was estimated in his contract. This must be the view which the circuit court took of the case, and certainly it is very plausible; but we are inclined to think, that, when analyzed, it will not present a basis sufficiently stable, or certain, or accordant with any known rule of equity, to maintain the decree which has been founded upon it.
Had the house alone been sold, there can be no reasonable doubt that Clay would not be liable; and had the value which Wagnon fixed on the stable at the time of the contract, been certainly ascertained, and had it been satisfactorily proved that the stable was the only or principal object of his purchase, perhaps it might have been but equitable that Clay should not be required to refund any portion of the price which he received for the stable. But it would be difficult to prove what Wagnon would have given for the lot without the stable, or what he would have given for the stable without the lot: or whether he would have bought the one without the other; or at what price he estimated the stable in the contract; or what, it was in fact worth to him; and there has been no proof on those points. A vendor of improved land may estimate the improvements at a *593 much higher price than their true value to the vendee, ■or than the vendee estimated them; and, though they mav have cost much, still the purchaser might not deem ihe-n of great, or even of any, value to him; and yet, desirous, for peculiar reasons, to own the land, he might be willing to give for it as much more than its real value, as his estimate of the accessary value of the improvements is exceeded by that of the vendor. • And, even though the improvements had been the chief object of his purchase, they may not have been worth to him, or lie may not have deemed them worth as much as the vendor exacted for them, or as others would say they were worth. In any such case, it would be obviously unjust, in the event of an eviction, after a removal of the improvements, to allow the vendor a credit for the amount at which commissioners might estimate them at the date of the purchase. The only safe rule, is to consider the land and the improvements as an entirety — so sold and so bought; and to allow the vendor a credit for so much only as the vendee would have had right to demand for the improvements, of the evictor, had they remained on the land until the eviction. A case might occur which would authorize the application of a different rule; but ‘there is no such peculiarity in this case as to except it from the operation of the principles which must govern cases generally between vendors and vendees.
But, as the removal of the stable, without Clay’s privity or concurrence, has imposed bn him the hazard of not being able to prove, that its accessary value, at the time of eviction, was as great as it might actually have been had it not been removed, or of not being able to prove, that it would have been any thing, he should have the election to take the value of the stable as a movable structure, or whatever it was, as such, worth to Young, when he removed it. In ascertaining what would have been the value of the stable at the time of eviction, or what the evictor should have paid for it, had it been permitted to remain on the lot until the eviction, it should be considered such as it should be presumed to have then been, had it been used and repaired *594 as a reasonably careful and provident occupant would have used and repaired his own property. According to that standard, tlie presumable value of the stable, at the time of eviction, should be ascertained; its value as a movable improvement of the lot, at the time when it was removed, should also be ascertained, and Clay should then be permitted to make an election of the assessment which he may prefer; and should be allowed a credit accordingly.
Temote assignee A writing containing nnitual covenants is not assignable by lavo, and the transfer passes only the equitable right: hence in a chancery suit upon such a writing, by a is a necessary, and the intermediate assignees are proper, parties.
„ quest or the par Where there is a want of necessary parties, this court will not, in general, consider theme-rits of the case. But, at the reties here, the merits, as between them, may be decided.
The use ,of the consideration, and that of the lot, should be deemed equivalent. This, as a general rule between vendor and vendee of equal good faith, is just and reasonable. But, as the evictor was entitled to mesne profits for five years, Clay should be charged with interest for five years prior to the eviction, on the amount which he had received.
Wickliffe will be entitled to a decree for the amount of purchase money which was actually paid to Clay, with legal interest thereon, from five years before eviction, to the time of rendering the decree; after deducting the value of the stable, with interest to the same time, from the period elected for fixing its value, and also, the interest on so inuch of the consideration as Clay never received, to be computed from the date of the contract, to five years prior to the eviction.
As Wagnon’s assignment passed only an equitable right to Clay’s covenant (it being mutual and therefore not assignable by law,) Wagnon was a necessary, and Matthews a proper party: and therefore the merits of the case would not have been considered had not the present parties agreed in writing that, as between themselves, the cause should be now decided on the merits.
On the return of the case to the circuit court, the proper* parties should be made; for, otherwise prejudice to Wagnon, at least, and other suits about the matters now involved, might be the consequences of a final decree between the present parties.
Wherefore, it is decreed and ordered, that the decree of the circuit court be reversed, and the cause remanded for further proceedings and decree conformable with this opinion, *