## UNITED STATES *v.* GRISWOLD and Wife, and others.

*(Circuit Court, D. Oregon.* August 12, 1881.)

1. FRAUDULENT CONVEYANCE—ADMISSIONS OF GRANTOR.

   In a controversy between the creditors of a grantor and his grantee as to whether a conveyance to the latter was fraudulent or not, the acts and declarations of the grantor made after the conveyance and inconsistent with it, but while in possession of the premises or exercising control over them, are admissible in evidence to show the true character and purpose of the conveyance.

2. CONVEYANCE PROCURED BY A HUSBAND TO HIS WIFE.

   A conveyance to the wife procured by the husband upon a consideration moving from himself, if made in good faith and intended as an absolute gift or post-nuptial settlement, is good as against the subsequent creditors of the latter; but where it appears from the evidence that the conveyance to the wife is a mere device or contrivance to put the husband's property in his wife's name beyond the reach of creditors or the contingencies of business while he remains in the possession, control, and enjoyment of the same as though the legal title was in himself, a court of equity will disregard such device and hold her as the trustee of her husband, and subject the property to the payment of his debts at the suit of his creditors.

3. CONVEYANCE TO WIFE.

   The claim of a husband and wife that certain property once belonging to the former had been conveyed by his grantee to the wife for her own use upon a consideration moving from herself, considered, and disallowed as being inconsistent with the conduct of the parties; and because of the improbable and contradictory accounts given of the transaction by said parties, and the property directed to be sold as that of the husband to satisfy the demand of a judgment creditor.

4. UNSTAMPED CONVEYANCE.

   An unstamped conveyance is not therefore void unless the stamp was omitted with intent to thereby defraud the revenue. A conveyance is sufficiently stamped if stamped according to the actual consideration thereof, be that more or less than the nominal one.

5. SAME.

   In a suit brought to set aside a conveyance to the wife as fraudulent against the creditors of the husband, it is too late upon the hearing to raise the question that such conveyance or the record of it is void because the original is not duly stamped.

6. LIEN OF JUDGMENT AND CONVEYANCE

   *Semble* that section 268 of the Oregon Civil Code, which declares that a conveyance of real property shall be void as against the lien of a docketed judgment unless recorded within five days from its execution, should be limited to cases where such lien was acquired in good faith, without notice of such conveyance.

In Equity.

*Addison C. Gibbs, B. F. Dowell,* and *Rufus Mallory,* for plaintiff.

*E. C. Bronaugh,* for defendant Jane O. Griswold.

Before SAWYER, C. J., and DEADY, D. J.

DEADY, D. J.   On January 29, 1880, the plaintiff commenced this suit to subject block 38 and lot 1, in block 47, in the town of Salem, and appearing on the record of deeds since February 12, 1878, as the property of the defendant Jane O. Griswold, to the satisfaction of a judgment theretofore obtained by the United States against the defendant William C. Griswold.   At the same time applications were made for an injunction to restrain the defendants William C. Griswold and Jane O. Griswold from disposing of or encumbering the property, or taking the rents thereof, during the pendency of this suit, which were duly allowed, the latter on February 9th and the former on April 5th following.   The defendants answered separately—William C. Griswold on March 1st, Asahel Bush on March 19th, and Jane O. Griswold on May 27th.   Exceptions for insufficiency and impertinence were taken to the answer of William C. Griswold, which were disallowed, except Nos. 1 and 2 of the former, and as to these the answer was amended and refiled on April 7th.   Replications to the several answers were filed and testimony taken before an examiner, and upon commission, and the cause heard thereon before the circuit and district judge on April 11, 1881.   The following facts are admitted or fully proven:

On January 29, 1874, the defendant William C. Griswold wrongfully collected from the treasury of the United States, by means of false and fraudulent vouchers and affidavits, the sum of $16,114, and on May 27, 1877, the plaintiff, by B. F. Dowell, as informer, commenced an action against said Griswold, in the district court of Oregon, under sections 3490 and 5438 of the Revised Statutes, to recover damages and forfeitures given by said sections therefor, in which, on July 30, 1879, it obtained the judgment aforesaid for the sum of $35,228, damages and forfeiture, and $2,900 costs and disbursements, which was duly docketed on the same day, and thereupon became and is a lien upon all the real property of said Griswold in the state.

On September 16, 1879, an execution was issued upon said judgment against he property of the defendant therein, which was returned with $174 made thereon, and "no other property found in the district."   Thereupon the plaintiff commenced this suit to set aside certain conveyances of said property, whereby the legal title thereto was passed from said William C. Griswold through third persons to said Jane O. Griswold, *as fraudulent,* so as to subject the same to the payment of said judgment.

As early as 1852 the defendant W. C. G. was engaged in the mercantile business at Salem, Oregon, and so continued until 1860, about which time he removed to New York, where he made his home until since the commencement of this litigation.

On January 25, 1854, he was married to the defendant J. O. G., at Hartford, Connecticut, who resided in New York since about 1860.

On July 16, 1855, the defendant W. C. G. purchased the property in ques-

tion from William H. and C. A. Willson, his wife, the donees of the Salem donation claim, and in 1856 he erected a large brick building on said lot 1, since known as "Griswold's block," in which he did business while he remained in Oregon.

In 1865 and prior thereto, W. C. G. was engaged in the hat and cap business in New York, and in mercantile ventures in Texas and Tennessee, and in 1867 became embarrassed from losses and depression in business.

On December 21, 1867, Griswold and wife conveyed the premises to James M. Adams, since dead, a liquor dealer in New York, and related to the latter in the fourth degree, for the nominal consideration of $22,500, by a deed stamped with only $11.50 worth of stamps, and recorded on February 10, 1868.

On December 19, 1868, said James M. Adams conveyed the premises to Chester Adams, of Hartford, Connecticut, his uncle, a man of wealth, and a particular friend of said J. O. G., for the nominal consideration of $22,000, by a deed stamped with only $11 worth of stamps, and recorded on February 1, 1869; and on December 30, 1870, the executors and beneficiaries under the will of said Chester Adams, he having died on July 6, 1870, conveyed the premises to said J. O. G. for the nominal consideration of $10,962.63, by a deed which was not recorded until February 12, 1878.

This latter deed recites that the conveyance from James M. to Chester Adams of December 19, 1868, though "in form absolute," was in fact "conditional," and intended by the parties thereto "as security" for the sum of $9,619.63, with interest thereon from April 1, 1869, "upon the distinct and express agreement and understanding that upon payment of said sum by said J. O. G. the said Chester Adams was to grant and convey said estate to said J. O. G."

On December 31, 1868, Griswold, for the purpose of procuring a settlement or compromise with his creditors, or the principal ones of them, filed his petition in bankruptcy in the district court for the eastern district of New York, and was duly adjudged a bankrupt thereon, and on November 15, 1869, received a discharge from his debts, he having in the mean time effected a settlement with his principal creditors, to whom he was indebted as indorser, for about 33⅓ cents on the dollar.

On May 31, 1865, W. C. G. gave Mr. Chester N. Terry, of Salem, a power of attorney, authorizing him to act as his agent, under which he took charge of this property for about five years, collected the rents, giving the receipts therefor in the name of Chester Adams after October 1, 1869, paid the taxes, and remitted the remainder to W. C. G. at New York. During this period, between 1867 and 1870, the latter visited Salem to look after the property, and while there told Terry more than once that he was financially involved in New York, and that "he had deeded the property in Salem to James M. Adams, in order to protect it from his creditors in New York, and that as soon as he could arrange his affairs satisfactorily in New York he would have his Oregon property deeded back to him again."

In 1870 and 1871, W. C. G. made additions to the building on said lot 1, at a cost exceeding $5,000, which he personally superintended and paid for. After the termination of Terry's agency, W. C. G. continued to manage the property.

paying the taxes and receiving the rents either in person, giving receipts in his own name and as for himself, or by his agent, Mr. J. J. Murphy, until June, 1879, since when the rents have been collected by the defendants Ladd & Bush, bankers of Salem, in the name of J. O. G., and accounted for to her until December, 1879, from which time they have been collected by the receiver herein.

On April 13, 1878, said lot 1 was conveyed by Griswold and "J. O. G., his wife," to the board of commissioners for the sale of school lands, to secure a loan of $5,000, payable in one year thereafter, with interest at the rate of 10 per centum per annum, which money was received by said Griswold and used in his business as his own, and still remains unpaid, except the portion of the rents applied thereon by the receiver.

From 1867 to 1878, inclusive, the premises were assessed and valued for general taxation as follows: 1867, to W. C. G., $25,000; 1868 and 1869, to James M. Adams, at $25,700; in 1870, to Chester Adams, at $18,000; from 1871 to 1876, inclusive, to W. C. G., at from $23,600 to $21,300; in 1877, lot 1, to Chester Adams, at $19,000, but block 38 to W. C. G., at $1,500; and in 1878, lot 1, to J. O. G., at $18,000, and block 38 to W. C. G., at $1,200. These valuations, according to the established usage of the country, did not exceed one-half the real value of the property, and probably not more than one-third.

Until some time after the commencement of this litigation it does not appear by any act or declaration of Griswold or his wife that this property was ever regarded by either of them as belonging to her, while every act and declaration of Griswold, and particularly what he said and did while actually in possession of the premises, points unequivocally to the conclusion that he was the actual owner.

But it is contended on behalf of Mrs. Griswold that Griswold's acts and declarations, after he conveyed the legal title to James M. Adams, are inadmissible to affect her right in the premises, unless assented to by her, citing, among other authorities, 2 Phil. Ev. note 481, p. 655.

It is admitted that the general rule is, as therein stated, "that declarations made by the person under whom the party claims, after the declarant has departed with his right, are utterly inadmissible to affect any one claiming under him." But it is understood that this rule does not apply where the declarant has not parted with the possession as well as the title. When the question of whether a conveyance is fraudulent or not arises between the grantee and the creditor of the grantor thereon, the creditor may always show that notwithstanding the conveyance the grantor continued in possession and control. To this end acts of the grantor implying ownership and control may be shown, and, also, as a part of the *res gestæ*, the declarations accompanying such acts or possession may be proven to show the nature,

extent, and purpose thereof. See 2 Phil. Ev. note, *supra*, pp. 654, 652.

In *Trotter* v. *Watson*, 6 Humph. 509, as stated in 1 Meigs' Dig. 549, it was held that "if a party make a deed, and retain the possession of the property inconsistently with the terms of the deed, his statements in reference to the ownership, or contract, or terms upon which he holds the possession of the property, may be received as part of the *res gestæ*. In such a case the possession of the property is a badge of fraud, which of itself connects him with the claimant in the suspicion of a confederacy to defeat creditors. His declarations, therefore, in relation to the property, and the character of his possession of it, become part of the wrong doing, and as such is evidence."

Greenleaf, (vol. 1, § 109,) after stating that there had been some difference of opinion as to the admissibility of such declarations, and that it was well settled "that declarations in disparagement of the title of the declarant are admissible as original evidence," says:

"But no reason is perceived why every declaration accompanying the act of possession, whether in disparagement of the declarant's title, or otherwise qualifying his possession, if made in good faith, should not be received as a part of the *res gestæ*, leaving its effect to be governed by other rules of evidence."

In *Williams* v. *Hart*, 10 Rep. 74, the supreme court of Georgia (1880) held the declarations of a debtor, in possession of land after a sale by the sheriff upon an execution against the declarant to his son, to the effect that the sale was fraudulent as against creditors, admissible against the purchaser, citing with approval the rule laid down in 59 Ga. 711, that—

"So long as a debtor remains in possession of property which once belonged to him, and which his creditor is seeking to condemn as fraudulently conveyed, the *res gestæ* of the fraud, if any, may be considered as in progress; and his declarations, though made after he has parted with the formal paper title, may, by reason of the continuous possession which accompanied them, be given in evidence for the creditor against the claimant."

In *Cahoon* v. *Marshall*, 25 Cal. 202, the court, in speaking of the declarations of the vendor after a sale, says:

"This species of evidence is, as a general rule, inadmissible, and is never to be received unless it appears that the vendor's declarations were made while in possession of the property, with the knowledge or consent, expressed or implied, of the vendee, in which case his declarations, made while in possession of the property, * * * might be considered as of the *res gestæ*."

The rule deduced from the authorities by Bump (F. C. 569) is unqualifiedly in favor of the admissibility of the declarations. He says:

"When the debtor remains in the possession of the property his acts and declarations are competent evidence against the grantee. The possession is a part of the *res gestœ*, and the nature and character of the possession is an important point of inquiry. The acts and declarations connected with it, forming a part of its attendant circumstances, are collateral indications of its nature, extent, and purpose. They are admissible, not because any peculiar credit is due to the party in possession, but because they qualify and characterize the very fact to be investigated."

See, also, *Potter* v. *McDowell*, 31 Mo. 74; Whart. Ev. § 263.

It may be remarked, as bearing on this question and the consideration to be given to the leaning of the earlier authorities, that with the growth of the idea that it is better to enlarge the field of evidence than to restrict it, the admissibility of this kind of declaration is received with increasing favor; and it is safe to affirm that there is no reason why an act tending to show ownership on the part of the vendor, after sale, should be received as an item of evidence to prove the true chararacter of the alleged fraudulent transaction, which does not equally support the admission of the declaration which accompanies it, and is to all intents and purposes a part of it.

It is also contended on behalf of the defendants that admitting the conveyances that terminated in the one vesting the legal title to the premises in Mrs. Griswold were made with intent to hinder, delay, and defraud creditors, that the United States, not being a creditor of the Griswolds until after that date,—January 29, 1874, was not affected by the transaction and cannot be heard to complain of it. Upon this point it is contended by the plaintiff that Griswold's creditors at the date of his bankruptcy, who have not since been paid in full, are his creditors still, for that his discharge was and is illegal and void, because he fraudulently omitted from his schedule the premises in controversy, and certain Indian war scrip of the value of many thousands of dollars, including one item of $15,556.59 arising out of the expedition to aid the Oregon emigrants of 1854, which he had obtained from Ben. Drew, and afterwards, on April 20, 1871, collected in full from the United States, and such conveyances being void as to these then-existing creditors are void also as to the subsequent ones, including the plaintiff.

But admitting all that is alleged against the integrity of the bankruptcy proceeding, as that Griswold's discharge was fraudulently obtained for the reason stated, still the discharge is and has been in full force and effect ever since it was obtained, and is and was a valid and binding discharge from the debts then due from Griswold until

set aside or annulled in a suit brought for that purpose, in the court where it was granted, by an existing and injured creditor or the official assignee. It cannot be otherwise or collaterally attacked. Section 5120, Rev. St.; *Nicholas* v. *Murray*, 5 Sawy. 323.

The bankruptcy of Griswold having occurred before the United States became his creditor, and the discharge therein obtained being in full force, the same may be laid out of view, except as the fact may serve to throw light upon the motive and purpose of the conveyances to James M. and Chester Adams, and the subsequent conduct of Griswold. And the plaintiff not having become a creditor of Griswold until after the execution of these conveyances, as well as the final one to Mrs. Griswold, cannot be heard to impeach them on account of the fraudulent intent of the grantor, unless it appears they were also made with the intention to hinder, delay, or defraud subsequent creditors. *Reade* v. *Livingstone*, 3 John. Ch. 501; *Sexton* v. *Wheaton*, 8 Wheat. 229; 1 Story, Eq. Jur. § 361; *Dick* v. *Hamilton*, 1 Deady, 329.

The defendants Griswold and wife claim by their answers, substantially, that in 1865, the former being quite wealthy and the owner of property in value largely in excess of his then indebtedness, gave the latter, as her own property, bonds, stocks, and securities to the par value of $50,000; that afterwards, and a few months before going into bankruptcy, Griswold borrowed several thousand dollars of his wife to aid him in his financial embarrassments; that at the same time he sold the premises to said James M. Adams to enable him to pay debts and obtain money to use in his business, for, as *he* alleges, the following consideration: A debt of about $1,000, due from himself to J. M. A.; an agreement to pay a debt of $10,000, due one S. R. Jacobs, since dead; and a debt of $1,000, due some one else whose name is forgotten; and $10,000 or $11,000 in money and bonds, but in what proportion, or what bonds, he does not remember and cannot state. That soon after this said J. M. A. became financially embarrassed and wished to dispose of the premises at the price which it is alleged he paid for them—$22,500—and she, as *she* alleges, believing that the property would appreciate in value, applied to Chester Adams, a wealthy friend, to assist her in purchasing the same, which he did, she advancing him "$12,000 or something over" of the remaining bonds given her by her husband, and the balance, $9,619.65—the portion of the Jacobs debt that J. M. A. had not paid —being paid by Chester Adams, to whom the conveyance was made in trust for the wife and as a security for that sum; and that after-

wards Griswold engaged in speculation and was financially successful therein, and repaid his wife "a considerable portion" of the money borrowed of her, out of which she paid the said sum of $9,619.65, with interest, to the representatives of Chester Adams, and took the conveyance of the premises from them to herself. He denies that from the time of the sale to J. M. A. he was ever in the "actual" or "constructive" possession of the premises, or claimed them as his own, but admits that since the conveyance to his wife—December 30, 1870 —he has been in the actual possession and control of them, as her agent. She denies that from 1865 to February 12, 1868, Griswold had "the actual possession" of the premises or claimed the same as his own property, or that since said February 12th he has had such possession as her agent; and alleges that the rents were collected in the name of, and paid to, J. M. A. while he held the legal title, and until January 1, 1869, and thereafter until May or June, 1870, to said C. A., who accounted to her for them, when, by his consent, they were collected and paid to Griswold, who, in 1870–1, expended about $5,200 of them in the repairs and improvements aforesaid.

On February 12, 1879, and before the commencement of this suit, the defendant W. C. G. was examined under oath before a commissioner of this court, under title 2, chapter 3, of the Oregon Civil Code, in aid of an execution to enforce a judgment given in the action aforesaid, for damages and forfeitures, on December 14, 1878, for the same amount as the subsequent one of July 30, 1879, and reversed on April 22, 1879, in which, as appears from the short-hand report of his testimony, he swore that he conveyed the premises to James M. Adams, in consideration of ten or eleven thousand dollars that he owed him, upon the understanding that when the money was repaid the premises were to be conveyed to his wife; that J. M. A. wanted his money, and an arrangement was made, with his consent, by which Chester Adams advanced the sum due J. M. A. and interest, and took a conveyance of the property to himself, with the same understanding, that when he was repaid he should convey the premises to Mrs. Griswold, and that he gave her the money to pay Chester Adams' representatives when she received the conveyance from them.

In this examination, which was long and exhaustive,—reaching to 407 questions and answers,—nothing was said or suggested that Griswold had ever given his wife any money, bonds, stocks, or anything else except the money paid to the representatives of Chester Adams, and he stated positively that he never held any kind of government

securities except some "Oregon claim bonds," which he sold, and that he never had any "government loan bonds," except when he was in the hat business in the firm of Murphy & Griswold, when they used to receive them in payment of goods and dispose of them at once.

On March 25, 1879, and after the commencement of a suit similar to this to subject this property to the judgment of December 14, 1878, aforesaid, which was dismissed when said judgment was reversed, the defendant Griswold made an affidavit prepared by counsel, which was offered and read in that suit by the defendant Jane O. Griswold, upon the application of the plaintiff for the appointment of a receiver therein, in which he stated that in 1865 he was engaged in the manufacture of hats and caps in New York, and was solvent and worth $150,000, of which $50,000 was in stocks and bonds of the market value of $35,000 that he did not need in his business, and therefore gave to his wife, but that in 1866 he engaged "with other persons in the sale of merchandise" at Galveston and Memphis, and to enable him to carry on such business "more successfully" he borrowed from his wife "the stocks and bonds aforesaid and used them" therein; that in 1867 and 1868, "owing to the general depression in business," he "met with heavy losses," amounting to about $125,000, and in 1869 was compelled to go into bankruptcy; that in 1867 he was indebted to James M. Adams about six or eight thousand dollars, and sold him the premises for $22,500, that being "the reasonable value" thereof, which sum was paid as follows: By the discharge of said indebtedness, the delivery of United States bonds of the value of $10,-000, which he then transferred to his wife in part payment of the loan aforesaid, and by the payment of the balance in money; that such sale was absolute, but said J. M. A. verbally promised to allow Griswold to repurchase the property for the same price within a year if he was able, which he could not do; that in 1869, Mrs. Griswold being desirous of purchasing the property, said Chester Adams, a wealthy relative of hers, proposed to take a transfer of said $10,000 of United States bonds, and advancing the balance, buy the same on her account, and take the title in his own name and hold it as security for the advance, which was done; that afterwards said advance, amounting to about $9,600, was repaid by her to the executors of said C. A., who thereupon conveyed the premises to her, and that ever since she has been and is the owner of the same, and entitled to and has received the rents and profits thereof, and at no time since the said sale to J. M. A. "have I ever had any claim upon or interest in said property, or exercised any control over the same" except as agent of

the owners; that during the time said property was owned by said J. M. A. and C. A. respectively, as aforesaid, they had the possession of the same, and received the rents and profits thereof from their agent, Chester N. Terry, and that at the time the "property was conveyed to my said wife I had no thought of taking the benefit of the bankrupt act."

In an affidavit made by the defendant W. C. G., in this litigation, on December 12, 1879, he stated that he filed his petition in bankruptcy in May, 1869, which he had no thought of doing until a few months before, when the failure of Sanger & Co., for whom he was indorser to a very large amount, compelled him to go into bankruptcy, and was the sole cause thereof.

On November 6, 1879, the defendant Jane O. Griswold made and filed an affidavit in this case, upon the application for the appointment of a receiver, in which she stated that in 1865, while visiting at Hartford, Connecticut, and while she believed her husband was worth more than $150,000, he gave her ."a quantity of stocks and United States bonds and other securities, of the par value of $50,000; that "during the years succeeding 1865" her "husband became embarrassed, and frequently borrowed" from her, and within a year or so after said gift informed her that he would be compelled to sell the premises; that he did sell the same to said J. M. A., for which "money and bonds and other securities were paid to my husband by said Adams to the amount of $22,500," in her presence, at the time of signing the deed, less the amount the former owed the latter; that about a year afterwards she heard that the said J. M. A. was anxious to sell the premises at the same price he gave for them, and knowing that her husband had always regretted that he had been compelled to sell the property, and "at a sacrifice," "I was therefore anxious, if it were possible to do so, to purchase the said property, knowing I could *please* my husband by so doing, and at the same time secure a judicious investment," and learning that "all cash was required," and "not having at the time enough money or bonds" with which to make the purchase, and being in Hartford, "I applied to Chester Adams, who was a man of means and a person whom I had known for years, and whom I regarded as a friend," and asked him to purchase the property, which "after consideration he agreed to do" —advancing what was necessary for that purpose, in addition to "the bonds and other securities" given him by the affiant, and taking conveyance to himself; that it was then agreed between said C. A. and

affiant that he was "to collect the income" of the property, and "apply it on account of the money he had advanced," for which she was to pay him 10 per centum interest, and when fully re-imbursed for his advances he was to give her "the deed to said property;" and that she or her "agent" paid said C. A., at different times, "the whole of the purchase price—$22,500—for said property; the last payment being made some years afterwards," but at what "date she cannot specify positively," when the deed was delivered to her.

The defendants read the depositions of three witnesses from New York, from which it appears that they were creditors and friends of Griswold when he went into bankruptcy, and that he has since paid them in full; that they then knew of the sale to J. M. A., and that the other creditors did, but upon the latter point their knowledge is very indefinite and wholly negative, and entitled to but little weight. One of them, who was in the employ of Griswold, was present when the sale to J. M. A. was consummated and the deed delivered, and from the proceeds he received "some money" that Griswold owed him. Griswold objected to the stamp on the deed as being of greater value than was necessary, but the witness and another person present, who was "waiting for money from the same source," volunteered to pay for the stamp, and this trouble was obviated. Another, the junior partner of the lawyer in whose office the conveyance was prepared, states that Mrs. Griswold once left at his office 13 $1,000 United States bonds, while endeavoring to effect, as she said, the repurchase of the premises from J. M. A., but afterwards took them away, saying she was going to get Chester Adams to make the purchase for her.

In brief, the case made by the plaintiff is an apparent sale by a man in business of a valuable property to a relative of his wife for much less than its actual value, with a promise on the part of the vendee to allow the vendor to re-purchase at the same price within a year, which was accomplished substantially within the time by another relative and particular friend of the wife, taking a conveyance of it to hold for her until he was paid in advance; that at the date of the alleged sale the vendor was financially embarrassed, and in a year and 10 days thereafter went into bankruptcy, and within a year and six weeks from his discharge in bankruptcy a conveyance of the property is made to his wife in pursuance of the understanding with the grantee in the second conveyance, upon the payment by her of less than half of the nominal consideration of the original conveyance by the husband, and, during all this time and down to 1878, the vendor remains

in the possession and control of the property, and takes the rents and profits as his own and as though there had been no real change of ownership.

The explanation offered by the defendants is vague, indefinite, and improbable, and, in essential particulars, full of palpable and inexplicable contradictions, and leaves no room to doubt that from the beginning to the end the transaction was, at least, a contrivance to hinder, delay, and defraud the existing creditors of William C. Griswold, and that having gotten a discharge in bankruptcy from the debts due them, he furnished the money, $10,962.63, to procure the conveyance from the executors of Chester Adams to his wife, in trust for himself, thinking, probably, that it was still safer in her name than in his own.

Griswold has been for many years extensively engaged in the mercantile and manufacturing business, from which it may be reasonably inferred that he was in the habit of keeping ordinary books of account. Yet he has not dared, or been able to show, or offered to show, a single charge, entry, or memorandum relating to this transaction, or any part of it. Upon his first examination he was silent concerning this gift of $50,000 to his wife, but said substantially and positively that he never had any bonds to give her. If true, had he forgotten that in 1865 he gave his wife a third of his fortune, although he got it back within a year? Certainly not. He then said that the consideration for the conveyance to J. M. A. was only about $11,000, and that the conveyance to C. A. was upon exactly the same consideration from the latter to the former. In Griswold's affidavit of March 25, 1879, we first hear of this munificent and extraordinary gift from a man in active business to his wife, for no reason whatever but the pure pleasure of giving. But of what "stocks and bonds" it consisted, what their number and denomination, when and where payable and with what interest, when and where obtained and with whom deposited, is not even hinted at. Indeed, this convenient and serviceable gift comes upon the scene with as little note of preparation or air of probability as if it were a story taken from the Arabian Nights.

But, according to this statement, within a year he got back all these stocks and bonds to enable him to carry on his business "more successfully," while his wife states in her affidavit that he became embarrassed and "frequently borrowed" of her, and in her answer, that he borrowed "many thousand dollars" of her "to assist him in extricating himself from his financial embarrassments." But upon

this point it is unnecessary to discuss the evidence further. After a careful study of it, it seems impossible that this story of the gift to the wife in 1865 can be true; and upon this incredible and uncorroborated assertion of the defendants rests the whole fabric of the defence—that the premises belong to the wife.

It may be and is probably true that the conveyance to J. M. A. was not without some consideration; but it is not at all probable that this consideration was more than $11,500,—the sum for which the deed was duly stamped,—as the grantee, it may be presumed, would not accept a conveyance stamped for less than the actual consideration of it. And it may be that the conveyance was made for this consideration, subject to the alleged mortgage of Jacobs, of October 9, 1867, for $12,000; but even then it follows that $11,500 of the nominal consideration of the conveyance is fictitious. The reason for this is apparent, and coincides with the theory that the controlling purpose of this conveyance was to put the premises, or a substantial interest in them, beyond the reach of Griswold's New York creditors. In 1867, the year of the conveyance to J. M. A., this property was assessed for general taxation at $25,000, and must, therefore, have been considered worth at least from forty to fifty thousand dollars.

To make, then, the consideration in the conveyance to J. M. A. appear at all adequate, even assuming that it was made subject to the alleged Jacobs mortgage, it was necessary to put it up to at least $22,500. But there is no evidence as to the consideration of the Jacobs mortgage, except Griswold's statement and what appears upon the face of the instrument. A certified copy of the record of it, made December 2, 1867, was put in evidence by the defendant, which has "the like force and effect" as the original, (Or. Laws, 518, § 27,) and is *prima facie* evidence of the facts stated therein. In it the consideration is stated at $12,000, but under the circumstances this statement is entitled to but little weight. Bump on F. C. 575.

In his answer, Griswold states that the debt due Jacobs was "some $10,000," and in his deposition that the mortgage to him was $12,000, and that when he made his answer he had forgotten there was a mortgage. But upon the face of the deed it appears that it was only stamped for a consideration of $6,000, which fact is itself sufficient to overcome the bare recital in the deed and prove that the consideration did not exceed that amount. Indeed, when we consider that there is no attempt to show, not even by the oath of W. C. G., how this alleged indebtedness to Jacobs arose, it is extremely doubtful if there was ever any actual consideration for the mortgage to

him. But be this as it may, the conveyance to J. M. A., as between the parties, was only intended as a security for the money advanced or indebtedness discharged, and the property was to be held by the grantee in trust for Griswold. And whatever amount was paid in the process of substituting C. A. as creditor and trustee in place of J. M. A., and for the final conveyance to J. O. G., there can be no doubt but that the husband gave the direction and furnished the money, and therefore the wife now holds the property in trust for him.

The question of whether the conveyances to J. M. A., C. A., and J. O. G. were made with a fraudulent intent "is one of fact and not of law." Or. Laws, § 54. There can be no doubt that such was the intention so far as the existing creditors were concerned, but there is nothing to show that they were made with such specific intention so far as the plaintiff is concerned, while the reasonable inference is that the final conveyance to the wife was procured by the husband with the intent to put the property beyond the reach of his creditors, existing or subsequent.

But the conveyance to the wife by C. A. being made upon a consideration moving from the husband, she took the property in trust for him, and a court of equity will disregard such device, and subject it to the claims of the husband's creditors arising at any time during the existence of the trust or continuance of the device as fully as though it stood in his own name. *Doyle* v. *Sleeper*, 1 Dana, 536.

In this view of the matter the only remaining inquiry is, was the conveyance to the wife intended at the time by Griswold as a gift to or post-nuptial settlement on her, or was it merely a convenient device for putting the property where he might enjoy the benefit of it without the risk of admitted ownership—the liability of its being taken to satisfy his creditors, existing or subsequent?

At the date of the conveyance, Griswold having been discharged from his debts incurred prior to his bankruptcy, and none others appearing to have been then contracted, the conveyance to her of the property as an actual gift or settlement would be valid as against his subsequent creditors—such as the plaintiff. And in the absence of anything to the contrary, in a case free from suspicion, the proper inference would be that the wife took the property absolutely for herself, according to the terms of the conveyance. *Dick* v. *Hamilton*, 1 Deady 329.

But it is not claimed, on the part of the defendants, that the consideration for this conveyance was a present gift to the wife, but only

that it was the payment of a prior debt due from the husband to her, the existence of which is not only not proven, but actually disproved. But this is not all: the evidence is more than convincing that the wife's name has been used in this matter by Griswold from the beginning simply as a convenience and protection against contingencies that are liable to occur in the life of a speculating adventurer, without actually letting go his hold upon the premises, and that the possession, control, and enjoyment of the same have remained with him, with her knowledge and consent, as completely as though the conveyance from C. A. had been made directly to himself.

The unexplained failure to put the deed to the wife on the record for nearly eight years after it was made, and the fact that it was not made public and recorded until the probable effect of this litigation rendered it convenient to assert that the property was hers; the declarations of Griswold to his confidential agent, Mr. Chester N. Terry, a witness whose long and favorably-known residence in this state the court must take notice of, to the effect that the property was in fact his own; that it had been put into the names of the Adamses merely to ward off the claims of his New York creditors, and that he expected to get it into his own hands soon; the failure on the part of the husband and wife to give a credible or consistent account of the transaction, and the many gross and palpable contradictions and absurdities in the ones given by the former,—all point with certainty to the conclusion that the conveyance to the wife was procured by the husband upon a consideration moving from himself, and for his own benefit.

The plaintiff also insists that the conveyances to C. A. and J. O. G. were not legally acknowledged, and therefore are not entitled to record, and that for this reason they are void as against the lien of its judgment, irrespective of the intent or consideration with or upon which they were made. In support of this proposition section 268 of the Civil Code is cited, which provides, in effect, that a conveyance is void as against the lien of a judgment unless recorded within five days of its execution, as provided between conveyances of the same property in section 26 of the chapter on conveyances. Or. Laws, 518.

The conclusion already reached makes it unnecessary to pass upon this question. But, as the conveyance to J. M. A. is legal in form and duly acknowledged and recorded, and therefore passed the legal title from W. C. G. to the former, the lien of the judgment after-

wards obtained by the plaintiff against the latter could not affect the premises, and therefore there is no case for the application of said section 268. See *In re Estes*, 3 Fed. Rep. 134; S. C. 5 Fed. Rep. 60.

It is also claimed by the plaintiff that the conveyances in question are all insufficiently stamped, and are therefore void. As the court has found otherwise, because the stamps placed upon them were sufficient for the actual "consideration" upon which they were made, it is not necessary to decide the questions made in this connection.

But it may be properly suggested that the provision of the internal revenue act of June 30, 1864, (13 St. 293, § 158,) which declares that a conveyance not duly stamped "shall be deemed invalid and of no effect," applies only to cases where the proper stamp is omitted "with intent to evade the provisions" of the act, with intent to defraud the government of the stamp duty, and such fraudulent omission must be alleged where it is sought to set aside or avoid a conveyance on this account, or shown on the trial, if the question arises on the evidence. *Campbell* v. *Wilcox*, 10 Wall. 421.

The pleadings in this case are silent on the subject. If the plaintiff intended to attack the validity of these conveyances on this ground, he should have made the proper averments in his bill. Neither was the question made upon the production and proof of the record of the conveyances before the examiner. But the revenue act (Id. 292, § 152) also declares "that it shall not be lawful to record" a conveyance not properly stamped, and the record thereof "shall be utterly void," and "shall not be used in evidence," without reference to the intent or circumstances with or under which the stamp was omitted. The record of these conveyances, except the one to Jacobs, was introduced by the plaintiff, and the latter was introduced by the defendant, without objection on this ground, and it is too late to object on the hearing that the originals are not sufficiently stamped.

Besides, admitting that the record of the conveyance to J. M. A. is void because the original is not sufficiently stamped, it does not follow that the original is void also, for that depends upon the intent of the party making the deed; nor are we prepared to say that the lien of the plaintiff's judgment would prevail over this unrecorded conveyance, if otherwise valid, under the operation of section 268 aforesaid, unless it also appeared that such lien was taken or acquired in good faith, without knowledge or notice of such prior unrecorded conveyance.

Upon this point the plaintiff cites *Reed* v. *Heirs of Austin*, 9 Mo. 722; *Frothingham* v. *Stacker*, 11 Mo. 77; *Davis* v. *Owenby*, 14 Mo.

170. But these cases turn upon the peculiar statute of that state, and do not, as will be seen by reference to *Davis* v. *Owenby*, (p. 77,) prefer the lien of a judgment to the prior unrecorded deed, but only the deed of the purchaser at the sale on the execution to enforce said judgment.

In equity, a judgment creditor has not been regarded as a purchaser in the sense of the rule which prefers the right of a *bona fide* purchaser for a valuable consideration to a prior title under an unregistered deed. Story, Eq. Jur. §§ 1502, 1503a.

The fact that the conveyance of a subsequent purchaser, though first recorded, is not allowed by the analogous section 26 aforesaid to prevail over that of a prior purchaser, unless obtained in good faith, is a good reason why a court of equity, in administering and construing said section 268, should presume that the legislature, in enacting it, did not intend to make a conveyance void as against a subsequent judgment lien, unless the latter was also acquired in good faith.

As to the defendant Bush there is no equity in the bill. Admitting all that the plaintiff claims, it was not entitled to the rents and profits before the filing of the bill and the appointment of the receiver. The judgment and lien of the plaintiff only gave it the right to sell the property free from any subsequent encumbrances, and to apply the proceeds on its debt. Ordinarily, the rents and profits prior to the sale on a judgment do not belong to the judgment creditor, nor are they in any way affected by the lien of it.

In this case, the legal title being in the wife in trust for the husband and judgment debtor, the plaintiff is compelled to resort to a suit in equity to subject the property to its judgment, and for this reason may claim the rents and profits for the commencement of its suit as a compensation for the delay in enforcing the judgment caused by the defendant putting his property into his wife's hands.

It appears that Mr. Bush collected the rents of the property from June 11, 1879, until December 1, 1879, amounting to $2,608, as the agent of Mrs. Griswold, all of which is accounted for, as disbursed for taxes, repairs, $1,723.34 paid to Griswold by order of Mrs. Griswold, and $459.25 on hand, subject to a charge of $32.23 commissions.

There must be a decree dismissing the bill as to the defendant Bush, and declaring that Jane O. Griswold holds the legal title of the premises as the trustee and for the benefit of her husband, and that the master sell the premises as upon execution, and subject to the lien of

the said mortgage to the board of school land commissioners, and apply the proceeds upon the judgment of the plaintiff, less the costs of sale.

SAWYER, C. J., *concurring.* For direct evidence to establish the contested facts in this case we are compelled to rely mainly on the testimony derived from the defendants Griswold and wife themselves. The other testimony chiefly bears upon the probabilities or improbabilities of their various conflicting statements, and tends to show their acts in regard to, and their dealings with, the subject-matter of the contest from the date of the conveyance to J. M. Adams till the present litigation was moved. From the various conflicting statements alone of these defendants, made at different times, unillustrated by the surrounding circumstances and their acts, constituting a part of the *res gestæ,* shown in part by other evidence, it would be difficult to arrive at any satisfactory conclusion upon the facts at issue. Whatever the purpose and character of the first conveyance from Griswold and wife to J. M. Adams, as between themselves, may have been, I am satisfied, after a careful examination and consideration of all the evidence in the light of the attending circumstances, and the whole course of dealing with the property, that all moneys used to obtain a reconveyance of the title were furnished by W. C. Griswold out of his own funds and on his own account; that the title was taken and held in the name of Chester Adams, and subsequently of Mrs. Griswold, his wife, for his own use and purposes; that the property and its revenues have been in fact as absolutely under his dominion and control as if the legal title had stood in him; that neither the property nor the funds that went into it were ever in good faith given to Mrs. Griswold by her husband to really and substantially hold, control, and enjoy as her own sole and separate estate; but, on the contrary, that the legal title, with her consent and co-operation, was placed in her, and so held and employed for defendant W. C. Griswold's own uses and purposes; and, although the legal title stands in the name of Mrs. Griswold, that she holds it understandingly in trust for the use and benefit of her husband, in whom has ever been in fact the actual control and beneficial use until it was likely to become liable to be subjected to the satisfaction of the claim of the complainant against the defendant W. C. Griswold now in judgment.

At the time of the transaction by which the title was passed to Chester Adams for the benefit, as it is claimed, of the wife, Griswold was at least insolvent and on the eave of bankruptcy, for within two

weeks afterwards his petition in bankruptcy was filed. It is highly probable, also, from the course and character of events, that he was either embarrassed, or that he foresaw approaching embarrassment at the time of the prior conveyance to James M. Adams. Upon a consideration of all the circumstances appearing in the case, it is difficult to believe that these transactions, and especially the arrangement with Chester Adams and subsequent conveyance to Mrs. Griswold, were not made in actual intentional fraud of the rights of then existing creditors; and, although it is not probable that at the time of the conveyance to Chester Adams, or even when the title was subsequently transferred by his representatives to Mrs. Griswold upon payment of the amount due to Chester Adams' estate out of funds furnished by Griswold to his wife, Griswold specially contemplated by that means defeating the collection of the present indebtedness to complainant which did not then exist; yet I cannot resist the conclusion that the legal title was given that direction with the intent to protect the property especially from any demands then existing, and generally from any that might thereafter arise out of the operations and speculations in which Griswold was engaged, or in which he might thereafter engage, until he should again fully recover his lost sound financial position. All the circumstances justify the belief that these transactions were originally made, and the trusts so established afterwards kept continuously on foot, for the very purpose of putting and keeping the funds used in a position where the property and its income would be subject to Griswold's control and enjoyment, without being subjected to the payment of his existing debts, or to the risks of his subsequent speculative operations; or, in other words, for the purpose of putting himself in the position described by Mr. Justice Swayne, as "a settler purposing to throw the hazards of business in which he is about to engage upon others, instead of honestly holding his means subject to the chances of those adverse results to which all business enterprises are liable." *Smith* v. *Vodges*, 92 U. S. 183. From Griswold's own statements, at various times and to different persons, disclosed in the testimony, it would seem that he had not at any time since his bankruptcy, up to the moving of this controversy, considered himself to be in a position to safely take and hold this property in his own name, but that he contemplated doing so when the proper time should come.

The moneys which the complainant is now seeking to recover were obtained by Griswold through deliberate frauds in presenting to, and procuring payment from, the United States of false and unfounded

claims. It does not appear at what time these fraudulent practices first commenced, but the defendant Griswold seems to have been engaged in the business of purchasing and collecting claims against the government before the occurrence of the transactions under consideration. A party who could knowingly and deliberately obtain moneys by means of fraudulent practices, such as those resorted to by Griswold in obtaining the moneys covered by the judgment upon which this suit is based, is certainly capable of resorting to fraudulent practices to cover up and protect property already acquired. The whole atmosphere surrounding the transactions now in question is deeply tainted with fraud; and this condition of things tends to render a dishonest purpose highly probable in the pretended gift of Griswold to his wife. The maxim, *noscitur a sociis*, may well be applied to this voluntary settlement.

Could I be satisfied, as I should be glad to be, that the property in question was purchased by Mrs. Griswold with her own separate funds, even though such funds had been settled upon her by her husband, provided they were settled in good faith, as her sole and separate property, at a time and under circumstances which would legally justify such settlement, it would be my duty and pleasure, as a judge of this court, to protect her in its ownership and enjoyment. But in this instance the evidence does not appear to present such a case. The theory of the defence relied on, and the testimony and answers of Griswold and wife to support it, in view of all the testimony, cannot be accepted as entirely true.

There are remarkable, and, to my mind, irreconcilable discrepancies in the several statements of W. C. Griswold, made under oath at different times, as to the consideration, purpose, and character of the conveyances first to J. M. Adams, and from him to Chester Adams, and as to the bonds, claims, etc., in regard to which he was called upon to testify. Changes in the circumstances seem to have developed new recollections and new views; and the theory now relied on does not seem to have been fully developed till demanded by the exigencies of the defence of the present suit. The exact truth in regard to these matters can only be approximated by considering every part of these statements, conflicting and otherwise, in the light of all surrounding and attending circumstances. This I have carefully attempted to do, with the result already announced. Much might be said to support and illustrate the conclusions reached, but I do not deem it necessary, nor would it be profitable to again go over the field already so well covered by my associate.

On the grounds indicated, I think the complainant entitled to the decree ordered, and I do not deem it necessary or advisable to discuss, or to express any opinions upon the other points relating to stamps, defective acknowledgements, records, etc., argued by counsel.