## UNITED STATES *v.* GRISWOLD and others.

### (*Circuit Court, D. Oregon.* August 12, 1881.)

1. **PRIORITY OF THE UNITED STATES**

    Section 3466 (1 St. 515, 676) of the Revised Statutes does not give the United States a lien upon its debtor's property, but only a right to priority of payment out of the same in certain cases, one of which is where a debtor not having sufficient property to pay all his debts makes a voluntary assignment thereof.

2. **SAME—ASSIGNMENT.**

    A debtor of the United States may assign his property, within the meaning of this statute, by means of judgments confessed in favor of various persons for amounts equal in the aggregate to the value thereof, and the priority of the United States will thereupon attach to the property and prevail against said judgments, but subject to all prior valid liens thereon.

3. **FRAUDULENT CONVEYANCE.**

    G. being liable to the United States, in a sum more than equal to the value of his property, for money fraudulently obtained from the treasury, asked L. & B. to loan him $10,000 on his note and mortgage, then exhibited, which they declined, but let him have $3,500 on the same, with a credit indorsed on the note of $6,500, and recorded the mortgage for the full amount. *Held*, that upon the facts the mortgagees did not take the mortgage in excess of the loan for the purpose of aiding the mortgagor to hinder, delay, or defraud the United States, and therefore it was not fraudulent as to them.

4. **SAME SUBJECT.**

    When a conveyance about which there is a suspicion of fraud will be allowed to stand as a security for the sum actually paid or advanced upon it.

5. **ATTORNEYS' FEE.**

    An unconditional fee of $10,000, secured by a mortgage on real property, for the services of a firm of three attorneys in defending an action in the district court involving a claim of $143,000 for damages and forfeitures under sections 3490 and 5438 of the Revised Statutes, and the character of the defendant, in which there were three jury trials concerning transactions scattered through a quarter of a century, and extending from the Atlantic to the Pacific, and one writ of error to the circuit court, and a final judgment against the defendant for $38,049, is not unreasonable, and furnishes no evidence that the mortgage was made for a sum larger than that agreed to be paid, for the purpose of hindering, delaying, or defrauding the creditors of the mortgagor, or in trust that a portion of the amount might be refunded to him.

6. **PRIORITY OF THE UNITED STATES—HOW ASSERTED.**

    A sale of property of a debtor of the United States, made upon a decree or judgment given after the right of priority of the latter attached, disregarded, and the matter referred to the master to take an account of the sums due on the valid liens thereon, and sell the property free from them and distribute the proceeds accordingly.

In Equity.

*Addison C. Gibbs*, for plaintiff.

*C. B. Bellinger*, for defendants.

*Walter W. Thayer*, for defendants Ladd & Bush and Alberts.

*H. Y. Thompson* and *George H. Durham in propria persona* and for the defendant Hill.

Before SAWYER, C. J., and DEADY, D. J.

DEADY, D. J. On August 29, 1879, the plaintiff commenced a suit against William C. and Jane O. Griswold and others, the defendants herein, which, upon a demurrer for multifariousness, was dismissed as to said Jane O., and the plaintiff allowed to file an amended bill against the remainder of the defendants, which was done on January 9, 1880. From the amended bill it appears that on and prior to May 27, 1877, the defendant William C. Griswold was the owner in fee of certain real property situated in Salem, Oregon, including block 18, known as "The Agricultural Works" and "Griswold's Water-works," and lots 1, 2, 3, and 4, in block 36, with the water-power and appurtenances; lot 8, in block 10; and the west half of lots 1, 2, 3, and 4, in block 73; and that on said day the plaintiff, by B. F. Dowel, informant, commenced an action in the U. S. district court for this district, under sections 3490 and 5438 of the Rev. St., against said defendant, to recover about $17,000 wrongfully obtained by him on January 29, 1874, from the treasury of the United States, by means of false vouchers and affidavits, together with the damages and forfeitures allowed therefor, as provided in said sections, amounting in all, as claimed in the amended complaint, to the sum of $143,000; in which the plaintiff, on December 14, 1878, had a verdict for $35,228, and on January 11, 1879, obtained a judgment thereon for that amount, and $2,400 costs.

On April 22, 1879, said judgment was, on error to this court, reversed, and the cause remanded for a new trial, in which the plaintiff, on July 30, 1879, had judgment again for $35,228, and $2,821.60 costs, which was on the same day duly docketed in the lien docket of this court, and became and is a lien upon the real property of said defendant in Oregon. Afterwards an execution issued to enforce said judgment, which was levied by the marshal of the district upon the real property aforesaid, and upon certain other property of the defendant Griswold situate in Salem, from the sale of which last mentioned the sum of $174 was realized, and the writ returned, on November 17, 1879, "no other property found in this district," and the remainder of said judgment is still unsatisfied. On June 11, 1877, said Griswold borrowed of the defendants William S. Ladd and Asahel Bush the sum of $3,500, to secure the payment of which, with interest, he gave them a mortgage on said block 18 for the sum

of $10,000, bearing date June 4, 1877; and on June 4, 1878, said Griswold mortgaged said block 18, and said lots 1, 2, 3, and 4, in block 36, with the water-power and appurtenances, to the defendants W. Lair Hill, George H. Durham, and H. Y. Thompson, to secure the payment to them of his note for $10,000, given as a fee for defending the action aforesaid against him. On December 18, 1878, Griswold mortgaged said lot 8, in block 10, to Ladd & Bush, to secure the payment to them of a debt of $306.25, with interest thereon.

On January 6, 1879, Griswold voluntarily appeared and confessed judgments in the county court of Marion county in favor of Ladd & Bush for $348.82, and the defendants A. Kelly, Thomas A. Mauzy, W. G. Woodworth, William H. Watkinds, Benjamin Hayden, William H. Holmes, and James W. Nesmith for the aggregate sum of $3,223.13. On January 7, 1879, Hill, Durham, and Thompson commenced a suit in the circuit court for the county of Marion to foreclose their mortgage, and made the defendant Griswold and L. & B., and the other persons to whom judgments were confessed as aforesaid, defendants; in which, on February 11, 1879, there was a decree given that L. & B. recover of the defendant Griswold the sum of $3,816.16, and H., D., and T. the sum of $9,365.42, the balance due on Griswold's note, and that the premises described in the mortgages be sold to satisfy the same and costs; in pursuance of which they were sold by the sheriff to the defendant Hill, on March 22, 1879, for the sum of $13,500. On February 22, 1879, said lot 8 was sold to the defendant Burnett for the sum of $368, upon an execution issued out of said county court upon the judgment therein, aforesaid, in favor of L. & B.; and afterwards said L. & B. foreclosed their mortgage upon said lot 8, making the defendants Griswold and Burnett parties defendant to the suit therefor, and, upon process issued upon the decree therein given for said L. & B. for $374.37, said lot 8 and the west half of said lots 1, 2, 3, and 4, in block 73, were sold to said Bush for $388.94.

During the years 1878–9 Griswold purchased various "Oregon Indian war claims, and other government debts and claims, and to conceal them from the plaintiff" took the assignments thereof to his nephew, the defendant Edward Chamberlain, and the defendant J. H. Alberts, for which the latter, on November 29, 1879, gave his note to said Griswold for $1,577.

The bill also alleges that the mortgage to L. & B. for $10,000 was given and received in so much larger a sum than the real indebtedness of Griswold to L. & B., to enable him to hinder and delay the

plaintiff in the collection of its debt: that the mortgage to H., D., and T. for $10,000 was given and received in a much larger sum than was ever actually agreed to be paid said H., D., and T. for their legal services, or than they were worth, with the like intent, and that $3,000 was ample compensation for such services; that the judgments confessed as aforesaid by said Griswold were given and received on "fictitious and trumped-up accounts," with the like intent to hinder and delay the plaintiff; that all said mortgages, judgments, and assignments were given, confessed, taken, and received with the intent to defraud the plaintiff out of the debt for which it obtained judgment as aforesaid, and to defeat its priority, as provided for in section 3466 of the Revised Statutes; and that Griswold was insolvent at the several dates thereof, and intended thereby to assign all his property before the plaintiff could obtain a judgment in said action in the district court, of which the defendants, each and all, had notice at and before the taking of said mortgages, judgments, and assignments. The prayer of the bill is that the premises aforesaid be sold on the decree of this court free from the effect of said mortgages and judgments, and that an account be taken of the rents and profits thereof received by the defendants, and that the proceeds of such sale and account be first applied to the satisfaction of the plaintiff's judgment.

All the defendants except L. & B., in whose favor judgments were confessed, as aforesaid, and also the defendant Chamberlain, answered the bill, disclaiming any interest or right in or to the property in question, and consenting that it might be applied upon the plaintiff's judgment, and as to them the bill was dismissed, they paying the costs of their being made defendants. The defendant Griswold did not answer, and the bill was taken against him for confessed. The defendants L. & B., Alberts, and Burnett answered on February 28, 1880, jointly, and the defendants H., D., and T. on April 26, 1880; and the cause was heard upon the amended bill, the answers thereto, and the replications and evidence.

The defendants, by their answers, admit the fact of the making of the several mortgages and the confessing of the several judgments by Griswold, and the commencement, progress, and result of the action of the *United States* v. *Griswold*, as alleged in the amended bill, but severally allege that the mortgages given to them were given and received in good faith for the purpose of securing an actual indebtedness to L. & B. of $3,500, and to H., D., and T. of $10,000, upon which $500 was afterwards paid; that the judgment

in favor of said L. & B. was obtained in good faith for money then due them; that the assigment of "Oregon Indian war claims" to the defendant Alberts was made and received in good faith, and that such claims were purchased and paid for by said Alberts for his own benefit, and without any intention to defraud the United States; and that said Griswold was not insolvent at the date of said mortgages, and the same did not amount to an assignment of his property.

From the evidence it satisfactorily appears that the judgments confessed in the county court on January 6, 1879, in favor of Kelly and others, were procured and confessed by Griswold with the intent and for the purpose of delaying and hindering the plaintiff in the collection of its debt or claim against Griswold, and with the intent to defeat the priority of the United States as established in section 3466 of the Revised Statutes, (1 St. 515, 676,) which reads:

"Whenever any person indebted to the United States is insolvent, or whenever the estate of any deceased debtor, in the hands of the executors or administrators, is insufficient to pay all the debts due from the deceased, the debts of the United States shall be first satisfied; and the priority hereby established shall extend as well to cases in which a debtor, not having sufficient property to pay all his debts, makes a voluntary assignment thereof, or in which the estate and effects of an absconding, concealed, or absent debtor are attached by process of law, as to cases in which an act of bankruptcy is committed."

It also appears that Griswold, on December 31, 1868, filed his petition in bankruptcy in the eastern district of New York, upon which he was adjudged a bankrupt, and on November 15, 1869, was discharged from his debts upon a settlement or compromise with his principal creditors in which he paid them about $33\frac{1}{3}$ per centum of his indebtedness; and that at the making of the mortgages to L. & B. and H., D., and T., his property subject to execution, not including a portion of block 47, called the "Griswold Block," and block 38 in the town of Salem, and conveyed to James M. Adams by Griswold and wife on December 21, 1867, was worth not to exceed $25,000.

Assuming, then, that the mortgages to the defendants L. & B. and H., D., and T. are valid, these judgments, when docketed, operated to transfer to the creditors therein substantially all the property, ostensibly owned by Griswold, remaining after their satisfaction; and if they can be considered as an "assignment," within the meaning of the statute, the priority of the plaintiff took effect from the date of such judgments, and as to all the property upon which they were a lien, subject to the prior valid liens of third persons.

It is well settled that section 3466 of the Revised Statutes does not

give the United States a lien, but only a priority of payment out of the property or assets of its insolvent debtor, after it has passed by a voluntary assignment, or by operation of law, to a third person for the benefit of creditors or with the intent to defeat such priority.

By the statute, this priority only takes effect in four classes of cases:

(1) The death of a debtor without sufficient assets to pay his debts; (2) bankruptcy or insolvency manifested by some act pursuant to law; (3) a voluntary assignment by an insolvent debtor of all his property to pay his debts; (4) the attachment of the property of an absent, concealed, or absconding debtor. *U. S.* v. *Fisher*, 2 Cranch, 390; *Conrad* v. *Atlantic Ins. Co.* 1 Pet. 438; *Beaston* v. *F. B. of D.* 12 Pet. 133; *U. S.* v. *McLellan*, 3 Sumn. 350; *U. S.* v. *Canal Bank*, 3 Story, 81; 1 Kent, 247; Conk. Treat. 722.

Mere inability to pay, or a sale or a mortgage of a part of the debtor's property, is not sufficient to set the statute in motion; but the insolvency, if not established by legal proceedings resulting in the appointment of an official assignee, must be accompanied by a voluntary assignment of substantially all the debtor's property. So long as it remains in his own hands, any partial sale, transfer, or pledge of it does not bring the case within this statute. Nor is a sale or mortgage for a present consideration, and not on account of a pre-existing debt or obligation, an assignment, technically speaking, or within the spirit or meaning of the statute, which contemplates that the debtor shall thereby divest himself of his property for the benefit of one or more of his creditors. An assignment implies the relation of debtor and creditor between the assignor and those to be benefited thereby, and that the consideration therefor is an existing debt or liability. Bur. on Assignm. §§ 3, 4.

But an assignment may be made within the statute by one or more instruments to one or more persons at different dates, provided the circumstances warrant the conclusion that they are all the result of a pre-existing purpose to assign the insolvent's property for the benefit of his creditors. *Downing* v. *Kintzing*, 2 S. & R. 326. So far as this case is concerned, the question of Griswold's insolvency is not affected by the fact that he was adjudged a bankrupt in 1868, as the United States was not then his creditor; and even admitting, as the plaintiff claims, that his discharge was fraudulently obtained, still it is a valid and binding discharge from the debts then owing by him, until set aside or annulled in a suit brought for that purpose, in the court where it was granted, by an injured creditor or the official assignee. Section 5120, Rev. St.; *Nicholas* v. *Murray*, 5 Sawy. 323.

But apart from this, when Griswold confessed the judgments to Kelly and others for $3,571.95, he was doubtless insolvent, and intended thereby to prevent the United States from collecting the claim for which it had just obtained a verdict. His whole property, so far as appears, even if unencumbered, was not sufficient to pay this one debt. Nor is it material, in this connection, whether such insolvency was known or believed by third persons or not. The fact that the United States had a valid claim against Griswold for $35.228 since January 29, 1874, has been conclusively established by the judgment of the district court.

But, as all claim under these judgments has been formally abandoned by the creditors therein, except that of L. & B., it is only necessary to consider the effect of this conclusion as to the latter. These judgments being in effect a voluntary assignment by an insolvent debtor, the right of the United States to a priority of payment out of all his property, subject to all valid liens and encumbrances thereon, attached at once.

Under the law of the state a judgment, when docketed, is a lien upon the debtor's property, similar to that of a mortgage, and is in effect a convenient method of transferring such property to the judgment creditors. *Catlin* v. *Hoffman*, 2 Sawy. 491.

The sale, therefore, of lot 8, in block 10, and the west half of lots 1, 2, 3, and 4, in block 73, by L. & B., upon their execution to enforce said judgment and the one to enforce the personal decree in the suit to foreclose the mortgage of December 18, 1878, on said lot 8, was made subject to the prior right of the United States, and, so far as it interferes with the assertion of such right, must be set aside and the property resold upon the execution of the plaintiff, unless L. & B. account to the plaintiff for the value thereof, which the evidence tends to show is about $1,600, together with the rents and profits thereof, less the amount of their mortgage for $306.25, with interest.

As to the mortgage of L. & B. on block 18, dated June 4, 1877, these additional facts appear: Griswold was then insolvent, the debt which he owed the United States being greater in amount than the value of all the property claimed by him or in his name, but the defendants, although aware of the fact that the plaintiff had commenced the action against him to recover this debt, were not otherwise informed on the subject. It appears that on or about June 4, 1877, Griswold presented a note and mortgage upon block 18 for $10,000, payable, with interest at 1 per centum per month, in seven months, at the bank of L. & B. in Salem, and asked for a loan of

that amount on that security. Mr. Bush, to whom the matter was referred by the cashier, declined the offer on account of the amount, but after some negotiation and delay of some days, not extending beyond June 11th, he directed the latter to let Griswold have $3,500; and because the latter did not wish, as he said, to incur the trouble and expense of making a new note and mortgage, it was arranged between them to use the one already prepared, by indorsing on the note a credit of even date therewith of $6,500, but leaving the mortgage as it was for the full amount, in which condition it was recorded and remained. It is probable that Griswold intended to use the excess of this mortgage over the sum really secured by it, to ward off the plaintiff's claim, which he knew to be just and then in suit; but there is no evidence to warrant the conclusion that L. & B. had any object, in taking the note and mortgage as they did, but to secure their loan in a manner to accommodate Griswold, or that they knew or had reason to believe that he had any ulterior purpose in the matter.

This mortgage is not affected by section 3466, *supra*, giving the United States a priority, because Griswold was not then legally a bankrupt or insolvent; and, although unable to pay his debts, and therefore in fact insolvent, the conveyance did not amount to or pretend to be a voluntary assignment of all his property for the benefit of his creditors, but only a security for an ordinary loan that would not even constitute an act of bankruptcy under the bankrupt law. If it is invalid at all, it is because it is contrary to the statute of frauds, (Or. Laws, 523, § 51,) which is substantially a copy of 13 Eliz. *c.* 5, and provides, among other things, that every conveyance of any estate or interest in lands, "made with intent to hinder, delay, or defraud creditors of their lawful suits, damages, forfeitures, debts, or demands, * * * as against the person so hindered, delayed, or defrauded, shall be void."

The "question of fraudulent intent" is made by the statute "a question of fact and not of law;" and "the fraudulent intent" of a grantor is not to affect the title of "a purchaser for a valuable consideration," without notice of such intent. Or. Laws, *supra*, §§ 54 and 55.

The false statement of the consideration for the mortgage is a badge of fraud, but not conclusive evidence of it. Bump. on F. C. 33, 42. And in this case the explanation of how it came to be and remain in the mortgage is satisfactory, so far as the mortgagees are concerned; at least, we do not feel warranted in coming to the con-

clusion, from this circumstance alone, that the mortgage was understood to be fraudulent as to the excess of $3,500, so far as they are concerned.

But when H., D., and T. sought to foreclose their mortgage on the same property, and made L. & B. defendants in their suit, the latter answered, setting up the lien of their judgment in the county court for $348.82, and also alleged that they had a mortgage on the property for $10,000, which was then "in full force." The bill alleges that this answer was made with intent "to defraud" the plaintiff out of its debt by making it appear that L. & B. had a mortgage to secure an actual indebtedness of $10,000, instead of one for only $3,500. It may be admitted that the allegation in the answer is literally true—that the mortgage was "in full force"—but, nevertheless, it was calculated to make a false impression. It may have been "in full force" as a security for $3,500, or because it was uncancelled or not satisfied, but not otherwise; for in fact almost two-thirds of it was fictitious from the beginning, and so far never had any force. But this circumstance of itself cannot impair the validity of the mortgage, if it was otherwise valid. It is only material, in this connection, as the subsequent act or conduct of one of the parties to the transaction, that may serve to throw light upon the purpose and intent with which it was originally made and received. But when it is considered that there is no other act or declaration of the mortgagees that can be construed into an assertion or claim that this mortgage was in "force" otherwise than as security for the amount really loaned upon it—$3,500—and that in the suit in which this answer was made L. & B. only claimed and took a decree, February 11, 1879, for the sum actually due them,—$3,816.16,—we do not think this answer is sufficient to characterize the original transaction as fraudulent on their part. But admitting that the circumstances of the false statement of the consideration in the mortgage, and the claim in the answer that it was then "in full force," are suspicious, and not satisfactorily explained by the mortgagees, still we think it a case within the rule laid down in *Boyd* v. *Suydam*, 1 John. Ch. 478, in which it was held by Chancellor Kent that—

"When a deed is sought to be set aside as voluntary and fraudulent against creditors, and there is not sufficient evidence of fraud to induce the court to avoid it absolutely, but there are suspicious circumstances as to the adequacy of the consideration and *fairness* of the transaction, the court will not set aside the conveyance altogether, but permit it to stand as a security for the sum actually paid." See Bump on F. C. 288.

The mortgage is allowed to stand as a valid lien on the property for the amount loaned thereon, with interest, less the amount paid thereon by Griswold—$325.80—and the priority of the United States must be enforced subject thereto.

As to the mortgage of H., D., and T., to secure their fee of $10,-000, the evidence is satisfactory that the contract was made and the mortgage taken by them in good faith for the purpose claimed. It may be that Griswold was influenced in giving the mortgage in this amount by the consideration that he preferred to spend the property in litigation rather than allow it to be appropriated to pay what he owed the plaintiff. But there is no evidence in the case to sustain the allegation that this contract is tainted with a secret trust in favor of Griswold or any one else. The conversation between Griswold and Thompson, to which John Young testifies, wherein the latter said that, in some event, they would take the case up, and the former must pay them another $1,000, in addition to the $2,000 before agreed upon, is relied on as showing directly that the fee really agreed to be paid was much less than $10,000. But though it may be claimed from the general drift of the witness' testimony that this conversation occurred after the making of this contract and mortgage, there is a circumstance stated in it which plainly shows that it took place during the first trial, and, of course, before they were made; for Young states that after this conversation he saw Griswold on the street, who then told him "that the jury had disagreed;" and as this only occurred on the first trial, and before the contract and mortgage were made, it follows that the conversation between Thompson and Griswold in no way conflicts with them. It is also insisted that the fee is extravagant, and grossly in excess of the ordinary compensation allowed and paid for similar services in this state; and so much so, that the contract and mortgage ought to be considered and held fraudulent on that account for all in excess of $3,000. But the weight of the testimony does not support this conclusion. Besides, the services of the defendants having been rendered in the United States courts, the character and extent of them are well known to us.

The case was a very extraordinary one in many respects, involving a claim for $143,000, of which about $35,000 for damages and as much more for forfeitures was well founded in fact and law, besides very grave charges against the defendant's integrity. There were three jury trials—the first one resulting in a disagreement of the jury after being on 24 days; the second one occupied nineteen days and the third one fifteen. There was a motion for a

new trial, after which the case was taken to the circuit and heard there on error. The preparation and trial of the action covered a wide field of inquiry and controversy, extending over a period of nearly a quarter of a century, and reaching from the Atlantic to the Pacific. The time, labor, and expense devoted to the defence of the action by all the members of the firm was unusual, and nothing was spared or omitted by them to make it successful. The fee is admitted to be a large one—probably the largest unconditional and secured one then ever paid or promised in the state. But we do not think that there is any reason on that account to conclude that the contract is fictitious or the mortgage fraudulent. On the contrary, we think the fee, under the circumstances, was reasonable and well earned.

As to the allegation of the bill that the property covered by these mortgages was purchased with the money that the defendant Griswold had fraudulently obtained from the treasury of the plaintiff, the evidence tends strongly to establish the truth of it; but there is no evidence that the mortgagees in either of them had notice of this fact at the date thereof.

The plaintiff is entitled to relief, and, to that end, a decree will be made to the effect that the sale and conveyance of L. & B. of the west half of lots 1, 2, 3, and 4, in block 73, is declared void and annulled, so that the plaintiff may sell the same, upon the execution to enforce its judgment, as though said sale and conveyance had never been made; that the sale and conveyance to him (i. e., Burnett) of lot 8 in block 10, upon the execution issued to enforce the judgment confessed by Griswold in their favor, is also declared void and annulled; that the mortgage given to said L. & B. upon said lot 8 and block 18 are declared valid as securities—the former for the sum of $306.25 and the latter for the sum of $3,500; that the mortgage to H., D., and T. upon said block 18, and lots 1, 2, 3, and 4, in block 36, is also declared valid as a security for $10,000; and that, subject to the liens of these respective mortgages, the plaintiff is entitled to a priority of payment out of the proceeds of the sale of said lot 8, block 18, and lots 1, 2, 3, and 4, to secure which the case is referred to the master of this court to take and state an account between said mortgagees and the plaintiff, crediting them with interest on their respective debts as per contract, and sums paid for taxes and repairs, if any, and charging them with the payments thereon, and the rents and profits received from the property, if any, and to sell said lots and blocks as upon execution, and apply the proceeds (1) to the payment of the expenses of the reference; (2) to the payment of the debts secured by the several

mortgages thereon, according to their priority; (3) to the payment of the plaintiff's taxable costs and expenses in this suit, and the remainder upon the judgment in the case of the *United States* v. *Griswold,* aforesaid.

No proof having been made in the allegations of the bill concerning the defendant J. H. Alberts, the bill is dismissed as to him.