## UNITED STATES v. GRISWOLD.

*(District Court, D. Oregon. June 10, 1885.)*

FALSE CLAIMS AGAINST UNITED STATES — ACTION UNDER SECTIONS 3490–3494, REV. ST.

An action brought by a private prosecutor under sections 3490–3494, Rev. St., to recover damages and forfeiture for a violation of section 5438, Rev. St., is what was known at common law as a "popular" or *qui tam* action, and is under the sole and exclusive control of said prosecutor, subject to the restriction on his right to discontinue the same, contained in section 3491, Rev. St., and his interest or share in any judgment obtained therein is his absolute private property, and the United States cannot compromise, remit, or release the same by pardon or otherwise.

Motion for leave to enter satisfaction of judgment. The opinion states the facts.

*James F. Watson*, Dist. Atty., for the United States.

*H. Y. Thompson*, for defendant.

*James K. Kelly*, for prosecutor.

DEADY, J. By section 3469, Rev. St., it is provided as follows:

"Upon a report by a district attorney, or any special attorney or agent having charge of any claim in favor of the United States, showing in detail the condition of such claim, and the terms upon which the same may be compromised, and recommending that it be compromised on the terms so offered, and upon the recommendation of the solicitor of the treasury, the secretary of the treasury is authorized to compromise such claim accordingly."

The district attorney now applies for leave, under this section, to enter satisfaction of the judgment in this case in pursuance of an alleged compromise by the secretary of the treasury of the sum or debt remaining due thereon, to-wit, $23,576, for the sum of $100.

It appears from the petition that on May 27, 1877, the United States, by B. F. Dowell, commenced an action in this court against William C. Griswold, under sections 3490–3494, Rev. St., for certain forfeitures and damages, on account of the violation of section 5438 of said statutes, in knowingly making, presenting, and obtaining payment from the treasury of the United States, in January, 1874, of certain false claims, commonly called "The Jesse Robinson Claims;" that thereafter, on July 30, 1879, a judgment was duly entered in said cause in favor of the United States and against the said Griswold for the sum of $35,228, together with costs and disbursements, amounting to $2,875.60; that divers sums have since been collected by execution and applied on said judgment, but there remains still due and owing thereon the sum of $23,576; that on November 22, 1884, the secretary of the treasury, on the report and recommendation of the district attorney and the solicitor of the treasury, compromised said claim for $100, and the release of Griswold's interest in certain property situate in Salem, Oregon, and known as "The Agricultural Works;" that said Griswold has paid said sum of money and executed said release to the United States; and that the solicitor of

the treasury, in a correspondence between himself and the district attorney, copies of which are annexed to the petition, has directed the latter officer to take the necessary steps to carry said compromise into effect. In his letter of November 22, 1884, the solicitor of the treasury says:

"It may be proper to state that I entertained serious doubts as to my authority to compromise such a claim or judgment, and accordingly the secretary of the treasury submitted the matter to the solicitor general. That officer determined the question in favor of the jurisdiction of this office, but added: 'Even if this conclusion was somewhat uncertain, I might still give the above advice, seeing that if it be mistaken the prosecutor may have relief by proceedings in court, whereas, if the advice was to the contrary and mistaken, Griswold could have no means of correcting it that occurs to me.' In order that any rights that Mr. Dowell may suppose he possesses may be fully protected, and, *if possible, adjudicated,* you are hereby directed, before taking the necessary steps to carry this compromise into effect, to *formally* notify him of your intention to do so, giving *him ample time to appear* in court, and make such objection thereto as he may determine his interests require, as I do not desire that Mr. Dowell shall be so situated by your action, or by that of this office, that he can hereafter successfully set up any claim for damages or otherwise, either in court or before congress."

In pursuance of this direction, the prosecutor, B. F. Dowell, was notified of this application, and appeared and answered the petition, and was heard by himself and counsel in opposition thereto. By his answer the prosecutor objects to the entry of satisfaction, alleging that he was not consulted concerning the alleged compromise; that the action in which the judgment was given was a *qui tam* one; and that the one-half of said judgment belongs to him, and the United States has no power or authority to compromise his share thereof without his consent. The prosecutor also alleges in his answer that the compromise ought not to be made for the further reason that Griswold has claims on the government of considerable value, specifying them in detail, and a lot in Salem, Oregon, that should be applied on the judgment, and concludes by saying that he has offered and now offers to take one-third of the balance due for the whole judgment. The amount received on this judgment, except a trifling sum, was not made on executions issued thereon, but on a sale by a master of property theretofore fraudulently assigned by the judgment debtor to his wife, in pursuance of a decree of the circuit court in a suit conducted by the prosecutor to subject the same to the payment thereof, after tedious and costly litigation. *U. S.* v. *Griswold,* 7 Sawy. 311; S. C. 8 FED. REP. 557.

The property spoken of as "The Agricultural Works" was mortgaged by the judgment debtor to his attorneys and others after the action was commenced, and before judgment therein, and the amount now. due on said mortgages is probably more than the property is worth or will sell for. *U. S.* v. *Griswold,* 7 Sawy. 296.[1] But the interest of

[1]S. C. 8 FED. REP. 496.

said debtor in said property is the legal interest as owner and mortgagor, and is therefore bound by the lien of the judgment from the date thereof; and, if it is of any value, can be sold on execution, subject to the mortgages, and the proceeds of sale applied on the judgment. This being so, the release of Griswold's interest in this property is an idle thing—a mere make-believe—that neither inconveniences him nor benefits the United States. Therefore, the only consideration for this compromise by which Griswold is to be absolutely released and discharged from the payment of a judgment against him of $23,576, for and on account of money fraudulently obtained from the United States treasury, is this paltry sum of $100. And, further, the only reason given for this extraordinary favor, not to an unfortunate, but to a fraudulent, debtor, is that he has no visible property, and it will save the trifling trouble and expense of issuing an execution on this judgment once in five years, for the purpose of keeping it in force. In view of these facts, the transaction might more properly be characterized as a remission or pardon than a compromise. However, I suppose the right of the United States to release the defendant from this judgment, rather than the justice or policy of the act, as between it and Griswold, is the real question now before this court. And, *first,* what is the nature of the action authorized and regulated by sections 3490–3494, Rev. St., and what is the relation of Dowell to the same, and the nature of his interest in the judgment given against the defendant therein?

Section 3490, Rev. St., provides that if any person, not in the army or navy of the United States, "shall do or commit any of the acts prohibited" by section 5438 of said statutes,—that is, among other things, knowingly make or present for payment any false claim against the United States,—he shall forfeit and pay to the same the sum of $2,000, and double the damages that the United States may sustain by reason thereof, together with the costs of suit, which forfeiture and damages shall be sued for in one action.

Section 3491 gives the district court of the district where the offender may be found, jurisdiction of the action, and adds:

"Such suit may be brought and carried on by any person, as well for himself as the United States. The same shall be at the sole cost and charge of such person, and shall be in the name of the United States, but shall not be withdrawn or discontinued without the consent, in writing, of the judge of the court and the district attorney."

Section 3492 makes it the duty of the district attorney to be diligent in looking after and prosecuting such cases; and section 3493 enacts that—

"The person bringing said suit and prosecuting it to final judgment shall be entitled to receive one-half of the amount of such forfeiture, as well as one-half of the amount of the damages he shall recover and collect; and the other half thereof shall belong to and be paid over to the United States; and such person shall be entitled to receive to his own use all costs the court may award against the defendant, to be allowed and taxed according to any pro-

vision of law or rule of court in force, or that shall be in force, in suits between private parties in said court."

At common law an action thus authorized to be "brought and carried on" by any person, "as well for himself as the United States," was called a "popular" action, because given to the people in general; and when the penalty, as in this case, was given in part to the prosecutor and the remainder to the king or other public use, it was called a *qui tam* action, because the plaintiff therein was described as one who sues for the king as well as for himself,—*qui tam pro domino rege, quam pro se ipso in hoc parte sequitur.* The action might be maintained in any case where a statute imposed a penalty for the commission or omission of a certain act, and gave the same, in whole or in part, to any one who would sue for it; and it was brought in the name of the person prosecuting it, and was exclusively under his control. 3 Bl. Comm. 160; 1 Bac. Abr. 73; *U. S.* v. *Griswold,* 5 Sawy. 25; *Bush* v. *U. S.* 8 Sawy. 327; S. C. 13 FED. REP. 625.

The fact that the statute in this case requires the action to be brought in the name of the United States, and provides that it shall not be discontinued without the consent of the judge and district attorney, does not change its character in this respect. These are mere restrictions on the mode of exercising the right to bring and maintain the action, and do not affect any substantial interest of the prosecutor in the proceeding or the fruit of it. Indeed, although this action was brought, at common law, in the name of the prosecutor, it was always set forth that it was also brought for the benefit of the king or other public use, as well as himself; and while the position of the parties is reversed here, and the action is brought in the name of the United States, it is brought for the benefit of the prosecutor as well as the government.

The provision concerning the discontinuance of the action is intended to prevent abuse of it, and is evidently borrowed from 18 Eliz. c. 5, which prohibits a plaintiff in such an action from compounding or compromising the same without the consent of the court. 1 Bac. Abr. 84. By virtue of the statute prescribing the forfeiture and damages recovered in this case, and authorizing any one to sue for them who would, the defendant, Griswold, became bound to pay the same to the prosecutor herein, the one-half for himself and the other half for the use of the United States. The law implied a contract to that effect, and the judgment obtained thereon is so far the private property of the prosecutor, and cannot be released or satisfied without his consent, any more than if it had been obtained in a private action on the bond of the defendant. 3 Bl. Comm. 159. For, although the king might, by a pardon of the offender, bar or prevent a popular action before it was commenced, he could not, by this or any other means known to the law, interfere with its prosecution after it was commenced, or release or dispose of the prosecutor's interest in the judgment therein. 6 Bac. Abr. 134; 4 Bl. Comm. 399; Whart. Crim. Pl.

§ 528; 1 Bish. Crim. Law, §§ 909, 911; *U. S.* v. *Lancaster*, 4 Wash. C. C. 64; *Shoop* v. *Com.* 3 Pa. St. 126; *U. S.* v. *Harris*, 1 Abb. (U. S.) 110; *Ex parte Garland*, 4 Wall. 381; 2 Hawk. P. C. *c.* 37, §§ 34, 54.

In *Ex parte Garland*, Mr. Justice FIELD, in delivering the opinion of the court, when speaking of the effect and operation of a pardon, says: "There is only this limitation to its operation: it does not restore offices forfeited, or property or interests vested in others, in consequence of the conviction and judgment." And if the pardon of the offender would not release him from the obligation and effect of this judgment, so far as the prosecutor's interest therein is concerned, much less can the secretary of the treasury compromise it away under section 3469, Rev. St. By its terms this section is confined to claims in favor of or debts due the United States. But the share or interest of the prosecutor in this judgment is a debt due him from the defendant therein,—a claim in his favor and not that of the United States,—and is beyond and outside of the purpose and purview of the statute.

The case of *U. S.* v. *Morris*, 10 Wheat. 246, cited by counsel for the judgment debtor, is not in point. In that case, and others like it, arising under acts relating to customs and navigation, the statute under which the customs officers claimed an interest in the forfeiture did not give them any absolute right therein until the same was reduced to money and paid to the collector, who was then required to pay a moiety of the same into the treasury, and divide the remainder among the customs officers and informer, if there was one. The action was commenced and carried on by and in the name of the United States, and might have been discontinued at its pleasure. Besides, the act of March 3, 1797, (1 St. 506, section 5292, Rev. St.,) then in force, gave the secretary of the treasury full power to remit any forfeiture occurring under such acts without willful negligence or intentional fraud. The court held that the power of remission could be exercised by the secretary after judgment of condemnation and before the payment of the proceeds to the collector.

The *Confiscation Cases*, 7 Wall. 454, also cited by counsel for the judgment debtor, only go to the point that an action commenced by the United States under the confiscation act of August 6, 1861, may be discontinued by it without the consent of the informer. But the statute under which Dowell brought this action gave him one-half of the forfeiture and damages recovered therein absolutely and unconditionally, and for a very good reason. A forfeiture cannot occur under section 5438, Rev. St., without the party incurring the same being guilty of both fraudulent intent and conduct, while a violation of the customs and navigation laws, involving a forfeiture or penalty, may and often does occur without fraudulent intent or even willful negligence. In such case it is provided that the secretary of the treasury may remit forfeitures or penalties incurred without moral turpitude at any time before the same are paid to the collector, and all persons

who contribute to the prosecution with the expectation of sharing in the result do so subject to the exercise of this power. But in this case there is no reason, founded either in the justice or expediency of the case, why the government should reserve to itself the power to remit the forfeiture or damages given to the prosecutor as an inducement and reward for bringing and maintaining the action at his own costs and charges. The statute is a remedial one. It is intended to protect the treasury against the hungry and unscrupulous host that encompasses it on every side, and should be construed accordingly. It was passed upon the theory, based on experience as old as modern civilization, that one of the least expensive and most effective means of preventing frauds on the treasury is to make the perpetrators of them liable to actions by private persons acting, if you please, under the strong stimulus of personal ill will or the hope of gain. Prosecutions conducted by such means compare with the ordinary methods as the enterprising privateer does to the slow-going public vessel. But if the United States could, by pardoning the offender, or remitting the penalty, or compromising the claim, deprive the prosecutor of his reward after he had earned it, the statute would be a nullity; for no one would be foolish enough to incur the trouble and expense, or even the ill will, incident to the prosecution of an action for any such forfeiture and damages, subject to the right of the treasury, on ex parte statements and personal solicitation, to remit the same or compromise his judgment after it was obtained. Take this case for example. There were three jury trials and one hearing on error, in the first of which the jury stood eight to three for the plaintiff, and in the other two there were verdicts for the plaintiff for the sum of $35,228 each, on the defendant's written admission that he had obtained not less than $16,614 from the treasury on false and fictitious vouchers, and satisfactory proof that he did so knowingly. As this court said, in U. S. v. Griswold, 7 Sawy. 309, S. C. 8 FED. REP. 496: "The preparation and trial of the case covered a wide field of inquiry and controversy, extending over a period of nearly a quarter of a century, and reaching from the Atlantic to the Pacific." The defendant paid his counsel over $10,000 for their services, and when the prosecutor obtained judgment on the verdict his taxable costs and disbursements amounted to $2,821.60. Then followed a suit in equity to cancel a fraudulent conveyance by the judgment debtor of property to his wife. This cost time and money, and the final decree setting aside the conveyance and directing the property to be sold, and the proceeds applied on the judgment, was not entered until August 12, 1881, more than four years from the commencement of the action; and even then the department of justice, at the instance of the defendant, assumed to delay the sale of the property from time to time, so that the money on it was not realized until February, 1883. And now, to release the defendant from this judgment, and arbitrarily deprive the prosecutor of his share of this indebtedness, would, as was said by his

counsel on the argument, be "a shocking injustice." But I do not find that the law will allow it to be done. My conclusion is that the United States has no power over the prosecutor's share of this judgment, or right to release or compromise it in any way. It is his private property, and exclusively under his control.

The application must be denied, and it is so ordered.