Argued November 5, 1895; decided January 13, 1896.

## MORRELL v. MILLER.

[43 Pac. 490.]

1. FRAUDULENT CONVEYANCE.— M., being civilly as well as criminally liable for shooting plaintiff, deeded to L., his attorney, at a time when it was apprehended plaintiff would die from the effects of the shooting, his real estate, worth five thousand dollars, and gave him a bill of sale of his personalty, worth five hundred and eighty-five dollars, which together constituted all his property; they executing a secret declaration of trust, whereby, in consideration of the conveyances, L. agreed to defend M. in all suits or actions which might be brought against him, and to dispose of the remainder of the property as he and M. should agree. Thereafter it was agreed that the fees of L. should be one thousand dollars. C. and A. were then engaged to assist in the defense of the criminal matters, each to receive one thousand dollars therefor. C., desiring security on the land, and being unwilling to take a mortgage from M., and L. being unwilling to give security himself thereon, because of the trust agreement, M. gave a second deed to L. to cut out the trust as to the land; it being understood that L. should give a mortgage to C., which he did, and that A. should be paid out of the land, there being no understanding that M. should have any interest in the land. Thereafter L. conveyed the land to A., who had notice of all the circumstances,

subject to the mortgage to C., for a recited consideration of two thousand dollars. *Held,* that while the second deed to L. would be considered an absolute conveyance, as between him and M., and not void as to creditors, it was attended with such suspicious circumstances that it would be permitted to stand, as against creditors, only as security for the attorneys' fees.

2. CONSTRUCTIVE NOTICE OF FRAUD.— Where one attorney employs another attorney for his client, and tells him that his client will pay each of them a fee of one thousand dollars, and then conveys to the second attorney, subject to a mortgage of one thousand dollars given to secure the fee of a third attorney, for a recited consideration of two thousand dollars, land worth five thousand dollars, which the client had conveyed to the first attorney with an understanding that the second attorney should be paid out of it, the second attorney will be chargeable with notice of the nature of the first attorney's title, and take it subject to the rights of the client's creditors, that the conveyance to the first attorney be treated only as security for the fees of the attorneys.

3. FRAUD.— A transfer of property by a prisoner under indictment to pay counsel fees, which, though large, are not extortionate, is not void as to creditors, unless made for the purpose of rendering the property inaccessible to them.

4. LIABILITY OF GRANTEE IN FRAUDULENT CONVEYANCE.— Defendant, to whom plaintiff's debtor conveyed his personal property in secret trust for himself, is liable for the value thereof to plaintiff so far as he puts it beyond plaintiff's reach after he instituted his suit to set aside the conveyance as in fraud of creditors.

5. SUBROGATION.— A debtor made conveyances of land and personalty which, as against plaintiff, his creditor, were fraudulent as to the personalty, and, as to the land, amounted only to a mortgage. *Held,* that the grantee having used the personalty in paying off a prior lien on the land, after plaintiff commenced action to set aside the conveyance of personalty, plaintiff would be subrogated to such lien.

APPEAL from Multnomah: LOYAL B. STEARNS, Judge.

This is a suit to set aside certain conveyances and mortgages as being in fraud of creditors. The facts out of which it arose are briefly as follows: On November ninth, eighteen hundred and ninety-two, Joseph Miller shot and seriously wounded the plaintiff, Otto Morrell, for which offense Miller was arrested the same day, and on the fifteenth of December the grand

jury of Multnomah County returned three indictments against him for offenses growing out of said shooting. Afterwards, about April twenty-first, eighteen hundred and ninety-three, Miller was convicted on all three of the indictments and sentenced to serve a term in the penitentiary. On December tenth, eighteen hundred and ninety-two, the plaintiff began a civil action in the Circuit Court of Multnomah County against Miller to recover damages on account of said shooting, and on May third, eighteen hundred and ninety-three, obtained judgment for ten thousand dollars and costs, taxed at thirty-six dollars and fifty cents. On November eighteenth, eighteen hundred and ninety-two, Miller conveyed to the defendant Charles F. Lord, by deed of general warranty, in consideration of "one dollar and other valuable consideration," two ten-acre tracts of land situate in Multnomah County, and certain easements appurtenant thereto, by any bill of sale conveyed to Lord certain personal property, consisting in the main of a certificate of deposit for three hundred dollars and a promissory note of two hundred and eighty-two dollars and sixty cents. The deed and bill of sale cover all the property that Miller had. On November twenty-fifth the following declaration of trust was executed by Lord and Miller, showing the purposes of the deed and bill of sale, to wit: "This is to certify that for and in consideration of a certain warranty deed and bill of sale, placed upon record in the recorder's office of Multnomah County upon the twenty-third day of November, A. D., one thousand eight hundred and ninety-two, wherein Joseph Miller is grantor and Charles F. Lord is grantee, and of a certificate of deposit for three hundred dollars, and of a certain promissory note for two hundred and eighty-two dollars and sixty cents, sold, delivered, and in-

dorsed by said Miller to said Lord, for one dollar and other valuable consideration, the said Lord agrees to defend the said Miller in all or any suits or actions which may be brought against said Miller, and to make disposition of such remainder of said property as said Lord and Miller shall agree." On December ninth Miller, for the purpose of securing to the firm of McGinn, Sears and Simon their fee of one thousand dollars then agreed upon for defending him in said criminal matters, executed and delivered to the defendant H. E. McGinn a mortgage upon the land described in the deed to Lord, but, this security not being satisfactory to the firm, Miller afterwards, upon the same day, executed to Charles F. Lord another deed of general warranty, covering the same premises, which recites a consideration of two thousand dollars, and thereupon Lord executed and delivered to N. D. Simon his note for one thousand dollars, and mortgage upon said premises to secure the same. Both the mortgage to McGinn and the one to Simon were made to secure the same liability. During the course of these negotiations the defendant Mays was employed as counsel to assist in Miller's defense. On December sixteenth, Lord, by deed of general warranty, excepting only the mortgage to Simon, conveyed the premises to Mays, the deed reciting a consideration of two thousand dollars; and on April twenty-sixth, eighteen hundred and ninety-three, Mays and wife mortgaged the property for one thousand eight hundred dollars to the defendant W. H. Fowler. This suit was instituted May twentieth, eighteen hundred and ninety-three, and plaintiff seeks thereby to have all these conveyances and mortgages set aside. Fowler, although made a party to the suit, was not served and did not appear in person or otherwise.

The decree being in part adverse to the defendants
Lord and Mays, they come to this court by separate
appeals; but Lord filed no brief, and did not appear
either in person or by attorney at the argument of the
cause.   The plaintiff took a cross-appeal as to Lord
and Mays only.                         MODIFIED.

For F. P. Mays there was a brief by *Messrs. Cox,
Cotton, Teal and Minor,* with an oral argument by *Mr.
William W. Cotton.*

For H. E. McGinn and N. D. Simon there was a
brief and an oral argument by *Mr. Alfred F. Sears, Jr.*

For Otto Morrell there was a brief and an oral
argument by *Messrs. James R. Stoddard* and *Edward Byars
Watson.*

Opinion by MR. JUSTICE WOLVERTON.

1.   The first question made here, and upon which
the main controversy hinges, is upon the finding of
the court below: "That both said deeds of conveyance
from Miller to Lord, and Lord's deed of conveyance
to Mays, were intended by all the parties to convey
the legal title to said property in trust for said Mil-
ler; and that said legal title was taken under said
conveyance and held in trust for said Miller, and the
same is now held in trust for said Miller by said
Mays."  It is claimed this finding is not supported by
the evidence.   Let us examine first the testimony
touching the execution of the Miller deeds.   The dec-
laration of trust, which is signed by both Lord and
Miller, clearly establishes the nature of the first deed
to Lord.   The effect of the bill of sale and that deed,
when construed in connection with the declaration,

was to impress the property therein described, in the
hands of Lord, with a trust for certain purposes, —
*first,* to pay said Lord for his services "in all or any
suits or actions which may be brought against said
Miller," and, *second,* "to make disposition of such re-
mainder of said property as said Lord and Miller shall
agree." At the date of this transaction there had
been no understanding or agreement with Miller as to
the amount of Lord's fees for the services agreed to
be performed. Now, as to the subsequent deed. Lord
testifies that "afterwards he (Miller) made the state-
ment to me that he was willing to pay me as much as
he would pay Mr. McGinn; as much as he had talked
of paying Mr. McGinn. I then asked him what that
was, not knowing definitely at the time, and he told
me a thousand dollars. Then I asked him, in case we
engaged Mr. Mays as an attorney to assist in the trial
of the cases, said I presumed he would expect to re-
ceive the same amount as he had agreed to pay my-
self, which he assented to. And, I think, on that day—
that I should judge to be the twenty-third or twenty-
fourth of November; in that neighborhood—he author-
ized me to employ Mr. Mays, and I did so; informing
Mr. Mays that Mr. Miller had agreed, as with me, to
pay the sum of one thousand dollars. One thousand
dollars to Mr. Mays, and one thousand to myself—one
thousand to each—and we were to look after him in
all the cases, either civil or criminal, and also after
his own matters. * * * After these arrangements
were made, and I had this understanding with Mr. Mil-
ler, and had employed Mr. Mays, some time along the
first of December—possibly the first week—Mr. Miller
told me he desired to engage further counsel; and
that he had talked with Mr. McGinn, and he thought
McGinn would probably act as one of his counsel in

his cases, as well as myself and Mr. Mays. Some time, I think about the eighth, possibly, of December, eighteen hundred and ninety-two, Mr. Miller told me he had engaged Mr. McGinn at the same figure, that is he had agreed to give him the same amount that he was to pay Mr. Mays and myself, and he desired me to make out a mortgage to Mr. McGinn to secure his fee. I told him then that I did not desire to give a mortgage upon the property in the condition in which I held it, because I simply held the property as a mortgagee, and not in fee. He said he would see Mr. Simon about that, but Mr. Simon wanted a mortgage, and I should have to give him one. I think the next day, anyway the ninth of December, I came to the courthouse, and Mr. Miller said Mr. Simon had been there, and was waiting for me upstairs, if I recall. I talked with Mr. Miller, and he stated that he wanted me to give the mortgage to McGinn that day, and Mr. Simon was waiting upstairs, and would see me about it. I came upstairs and Mr. Simon — by the way, before coming upstairs I spoke to him again about making the deed; that I did not care to give it in the present shape in which the property was. He says, 'Well, I will sign a deed and you can then give a mortgage.' I came upstairs, and the deed was drawn up.  *  *  *  The second deed was an absolute deed to the property. I came upstairs, and I think Mr. Simon and I met in the law library, and the deed was drawn up there. Mr. Simon went below, and came back, and returned with the deed properly signed and witnessed. *  *  *  The mortgage was then drawn up in the law library, I think, and I signed the mortgage and executed it, and also the promissory note for one thousand dollars, after the · deed had been made by Mr. Miller to myself absolutely deeding the property to

me. * * * In the afternoon, when I went down to the jail, Miller informed me that Simon was waiting for me above to draw up the absolute deed to the property. I then explained to him that the agreement which had been entered into between us only related to the first deed, and would be inoperative so far as the second deed was concerned, and that he would either destroy the instrument or hand it back to me. I don't recollect whether he said he had destroyed it, or that he would hand it to me the next morning, but it was understood between us that he should either return it or destroy it, and I presumed, until I had been otherwise informed, that it had been destroyed. * * * There was no understanding or agreement between Mr. Miller and myself subsequently, or at the time of making the second deed, that he should have any interest whatever in the real property, the personal matter remaining as it was in the beginning. * * * He deeded the property to me absolutely, for the purpose of securing my fees and of paying other counsel who had been retained by him in the case." Question—"For the purpose of securing your fees or paying your fees?" Answer—"Well, of paying my fees. * * * The amount was understood thoroughly by Mr. Miller that you (Mays) was to receive for your services in the cases which came up the sum of one thousand dollars, and that sum and fee should be paid out of the property." On cross-examination the following testimony was elicited: Question—"Now, the only reason you give for changing this deed, which enables you to hold the title in trust for Miller, of the twenty-third of November, eighteen hundred and ninety-two, to what you say was an absolute deed on the ninth of December, eighteen hundred and

ninety-two, was the requirement on the part of Mc-
Ginn, Sears and Simon that they should have a mort-
gage on the property to secure their fee of a thou-
sand dollars? That was the only reason for it."
Answer—"That is the only reason there was for it;
yes, sir." Question—"And so you informed Miller of
that fact that you wanted an absolute deed because
McGinn, Sears and Simon wanted a mortgage, and he
thereupon gave you this absolute deed?" Answer—
"Yes, sir." Question—"And that is all there was of
it?" Answer—"And that is all there was of it."

In this connection Simon's testimony shows that the
McGinn mortgage was given in the morning. This not
being satisfactory, because the legal title was in Mil-
ler, it was arranged that Miller should execute to Lord
a second deed, and then that Lord should execute a
mortgage to Simon, and this was accordingly done the
same day, Lord executing the note for one thousand
dollars, which the mortgage was given to secure, Si-
mon writing out the second deed himself. Lord ad-
mits that he realized five hundred and eighty-five dol-
lars and sixty cents out of the personal property
which he had acquired under the bill of sale. From
this testimony we are to deduce the object and pur-
pose of the second deed, it being substantially all that
was offered bearing upon the subject, except as the
testimony adduced touching the value of the land may
affect it. The court below found from the testimony
of a multitude of witnesses called upon that question
that its value at the time these deeds and mortgages
were executed was five thousand dollars, and this find-
ing we are not inclined to disturb. Miller was not
called as a witness. A corollary contention is that,
whatever might have been the effect of the first deed
to Lord, the second was intended by the parties to be

and was in fact an absolute deed, and was given for the purpose of cutting out any trust in favor of Miller. It was evidently intended that the legal title should pass by the second deed, if it still rested with Miller at the time of its execution, as its purpose was to so invest Lord with such title as that he could execute a valid mortgage upon the premises to Simon. Lord says Miller deeded the property absolutely for the purpose of securing his fees, and paying other counsel who had been retained, but afterwards declared the purpose was not to secure but to pay his fees. Subsequently, but in the same connection, he says that it was thoroughly understood that Mays' fee should be paid out of the property. Upon cross-examination he testifies that the only reason he had for taking another deed was to enable him to mortgage the property to secure McGinn, Sears and Simon, he believing that the former deed was in effect but a mortgage, and that he was therefore without authority to execute the desired mortgage. And yet he says "there was no understanding between myself and Miller subsequently, or at the time of making the second deed, that he (Miller) should have any interest whatever in the real property, the personal matter remaining as it was in the beginning." This testimony is somewhat indefinite and unsatisfactory, and does not disclose a transaction wherein all the terms and conditions were distinctly understood and defined. Especially is this true as it concerns the consideration to support the deed. But it may be now asserted as a rule of law that where a deed is perfectly executed, and is intended to operate at once, no trust will result merely from the want of consideration, unless the attendant circumstances show that it was not intended the grantee should take beneficially: 10 Am. and Eng.

Ency. of Law, 56; *Philbrook* v. *Delano*, 29 Me. 410. If the consideration is inadequate, the rule would undoubtedly apply with equal force.

The "attendant circumstances" in the case at bar, other than those related may be briefly stated. Miller was under arrest for a grave offense, then thought to be more serious than it afterwards proved to be, he being apprehensive that Morrell would die of the wound received at his hands. . He had incurred a civil liability to Morrell because of the assault made upon him, and had previously transferred all his property, of the aggregate value of five thousand five hundred and eighty-five dollars and sixty cents, to Lord, for the purpose of securing his fees for service as an attorney, with a declaration of trust that the balance should be disposed of as he and Lord should agree. At the time of the execution of these deeds Morrell was a creditor of Miller under *Philbrick* v. *O'Connor*, 15 Or. 15 (13 Pac. 612). This being so, the plaintiff claims that the latter deed was fraudulent as to him, as well as the first. There are some attendant *indicia* of fraud, such as the transfer of all Miller's property of such considerable value to Lord; the declaration of a secret trust in connection therewith; and the inadequacy of consideration for the second deed. But, upon the other hand, Miller was deeply interested. He was in the toils of the law, charged with a grave offense, and his object was to extricate himself therefrom. The purpose of making such use of his property as to secure able counsel to conduct his defense, and to attend to other apprehended litigation, was perfectly legitimate. His right to be heard by counsel is a constitutional right, and he should be permitted, unless hindered by legal process, the free and untrammeled use of his property to obtain legal assistance, otherwise

constitutional privileges would be invaded.  Upon the whole, we believe the second deed was intended to bo and operated as an absolute conveyance of the title to said premises, and we are unable to say from the evidence that it is fraudulent and void as to creditors. But the transaction is attended with such suspicious circumstances that we ought not to permit the conveyance to stand, except as security for such liability as Miller legitimately incurred to meet the expenses of impending litigation, under the doctrine laid down by Chancellor KENT in *Boyd* v. *Sugden,* 1 Johns. Ch. 478: "When a deed is sought to be set aside as voluntary and fraudulent against creditors, and there is not sufficient evidence of fraud to induce the court to avoid it absolutely, but there are suspicious circumstances as to the adequacy of consideration and fairness of the transaction, the court will not set aside the conveyance altogether, but permit it to stand for the sum already paid." This doctrine has been followed in *Crawford* v. *Beard,* 12 Or. 447, (8 Pac. 537,) and *Philbrick* v. *O'Connor,* 15 Or. 15, (13 Pac. 612,) and applied by DEADY, J., in *United States* v. *Griswold,* 7 Sawy. 308 (8 Fed. 496); yet the application of this doctrine here must depend upon whether Mays afterwards purchased the premises in good faith, for a valuable consideration, and without notice of the infirmities of title; as, if he did so purchase, he cannot be deprived of the benefits secured by his deed from Lord.

2. Without going into the evidence upon this subject, it is sufficient to say that because of the fact that Lord arranged with Miller for the amount, manner of payment, and security of Mays' fee, and considering the nature of Lord's and Mays' employment, we have concluded that Mays is chargeable with constructive

notice, at least, of the nature of the title which Lord possessed, and therefore took subject to whatever claim plaintiff may have had upon the premises.

3. As to the fees which Lord and Mays were to receive for their services in the defense of Miller in the criminal and civil actions in which he became involved, while they were large and ordinarily would, perhaps, be deemed excessive, yet we cannot say that they were extortionate and unconscionable. There is no doubt that the evidence of Lord and Mays, against which there is no contradiction, establishes an express contract with Miller, whereby he agreed to pay each of them a thousand dollars for their services. At the time this agreement was entered into it was thought that Miller would ultimately be charged with murder in the first degree, but, as it turned out, his victim survived and three indictments were returned against him, one for an assault with intent to kill, and two for assault with a dangerous weapon. A trial was had upon two of these indictments; in one there was a mistrial, and a second trial was had. As to the third, Miller pleaded guilty. Mays and Lord appeared and assisted in the defense at each of those trials. Prior thereto they, in connection with the firm of McGinn, Sears and Simon, instituted a *habeas corpus* proceeding for the purpose of having the defendant admitted to bail, in which they were successful, and subsequently defended Miller at the trial of the civil action instituted against him to recover twenty thousand dollars' damages, in which the judgment for ten thousand dollars was secured which forms the basis of this suit. There being no evidence that these fees were purposely fixed at the amounts specified for the purpose of covering up Miller's property to render it inacces-

sible to his creditors, we cannot say that because of
the large amount thereof the contract supporting
them is void and ought to be disregarded.

4. This suit comprehends two funds, and the fair-
ness of the transaction by which Lord acquired them;
one consisting of real property, the status of which
we have determined, and the other of personal prop-
erty, out of which Lord realized five hundred and
eighty-five dollars and sixty cents. The greater por-
tion of this latter fund he had in his hands at the date
of the commencement of this suit, so that he could
not deal with it so as to change its legal status to the
detriment of plaintiff's rights during the pendency
thereof. There is no doubt, under Lord's own show-
ing, that he acquired and held this personal property
in secret trust for Miller. The declaration of trust es-
tablishes the fact. This fund should not be blended
or confused with the real property, as it is separate
and distinct therefrom. Lord had expended some of
it at the request of Miller, which may be regarded as
legitimate, prior to the commencement of this suit.
The exact amount we are unable to definitely deter-
mine, but it is within bounds to conclude that he had
in his hands at that time at least five hundred dol-
lars, for which amount plaintiff should have a decree
against him, as well as for his costs in the court be-
low.

5. At the time of the institution of this suit the
state had a judgment against Miller for costs in the
criminal proceedings for five hundred and nineteen
dollars, which it is admitted by all concerned was a
first lien upon the real property. In part satisfaction
of this lien, Lord paid in June, eighteen hundred and
ninety-three, through Mays, two hundred and forty-

seven dollars out of the fund arising from the personal property. An execution having been issued at the instance of the state, Mays, for the purpose of protecting his own lien, paid the balance of this judgment, amounting to two hundred and seventy-two dollars. As to these respective amounts plaintiff and Mays ought to be subrogated to the rights of the state. Aside from this Mays paid twenty-five dollars and forty-five cents taxes upon the premises, which ought to be repaid. With the Fowler mortgage we have nothing to do, as he was not served and made no appearance. Not having a day in court his rights cannot be determined in this suit. In view of these considerations, the decree will be that the sale and assignment of personal property by Miller to Lord be set aside, and that plaintiff have a personal judgment against Lord for five hundred dollars, and his costs in the court below; that the real property be sold, and the proceeds arising therefrom be applied, *first,* to the payment of two hundred and forty-seven dollars to plaintiff; *second,* to the payment of two hundred and seventy-two dollars to Mays, and the further sum of twenty-two dollars and forty-five cents taxes; *third,* to the payment of Simon's mortgage; *fourth,* to the payment of one thousand dollars to Mays; *fifth,* to the payment of two hundred and fifty-three dollars to plaintiff, and his said costs below; *sixth,* to the payment of one thousand dollars to Lord, and the balance, if any remain, to the satisfaction of plaintiff's judgment. Lord ought to have credit upon plaintiff's decree against him until satisfied for such sums as plaintiff may receive from the proceeds of the real property. Appellant Mays will have a decree here for his costs and disbursements upon the appeal.

MODIFIED.

Decided June 10, 1896.

## ON MOTION TO RECALL MANDATE.

PER CURIAM. This is a motion by respondent McGinn, Sears and Simon for an order recalling the mandate heretofore issued in this cause. The relief sought thereby seems to be to have the decree so modified as to relieve N. D. Simon and Henry E. McGinn from the requirement to cancel their mortgages, and to have the mandate withheld until the defendant Fowler can be barred of whatever interest he may have in the premises by a foreclosure of Simon's mortgage. The effect of the decree is to declare the deed to the real property in the hands of Mays an equitable mortgage to secure his reimbursement for certain moneys advanced in discharge of prior liens, and to secure him in the payment of certain fees to which he is entitled for services in the defense of Miller, subject, however, to the prior mortgage from Lord to Simon for one thousand dollars and interest. It also determines the priority of all liens of the parties to the suit except Fowler's. Fowler not having been served and not having appeared in the suit, no decree could be entered affecting his interest whatever it may be. The real property was ordered sold, and the proceeds applied in payment of the liens in the order of their ascertained priority, and that the parties to the appeal be barred and foreclosed of all right or interest therein. Although the suit was instituted for the purpose of having certain conveyances and mortgages set aside, which it is claimed were fraudulent and void as to plaintiff, and subjecting the premises to the payment of his judgment, the result was in effect a fore-

closure of all liens of the parties served affecting such premises. And it would seem that a purchaser at the sale would be subrogated to the interests of prior lien claimants with like effect as if the suit had been the usual foreclosure proceeding: 24 Am. and Eng. Ency. of Law, 261; *Sellwood* v. *Gray,* 11 Or. 534; *Watson* v. *Dundee Mortgage Company,* 12 Or. 474; *Brobst* v. *Brock,* 77 U. S. (10 Wall.), 519. For reasons stated herein, as well as in our opinion in the main case, we cannot now give relief against Fowler in this proceeding. Following the language of the entry below to which no objection had been offered, it was, among other things, ordered and decreed here, "that the respondents H. E. McGinn and N. D. Simon do within twenty days from the entry of this decree in the court below release or cancel their said respective mortgages on said real property on the records of said county." It is now desired that this language be stricken from the decree. While we think such order unnecessary yet it would seem to be mere harmless surplusage and we cannot see how it can have any greater effect than the order which follows that each and all the parties be barred and foreclosed of all rights or interests in the real property and every portion thereof." Aside from this it is a doubtful proposition whether this court can recall a mandate and alter or amend a decree after the expiration of the term in which it is rendered and entered.        MOTION DENIED.